**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **Ronald C. Cook,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:13-cv-00523** |
| | ) | **Judge Margaret M. Sweeney** |
| **United States of America,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**PLAINTIFF RONALD C. COOK'S CORRECTED MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT ONE OF THE AMENDED COMPLAINT, OR, IN THE <u>ALTERNATIVE, MOTION JUDGMENT ON THE ADMINISTRATIVE RECORD</u>**

<div style="margin-left:45%">

COUNSEL OF RECORD
Lee F. Berger
Paul Hastings LLP
875 15th Street, NW
Washington, D.C.  20005
Telephone:  (202) 551-1772
Facsimile:  (202) 551-1705
leeberger@paulhastings.com

OF COUNSEL
Devon E. Winkles
Paul Hastings LLP
875 15th Street, NW
Washington, DC  20005
Telephone:  (202) 551-1851

Barton F. Stichman
Thomas Moore
National Veterans Legal Services Program
1600 K Street NW, Suite 500
Washington, DC 20006
Telephone:  (202) 265-8305

*Counsel for Plaintiff*

</div>

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES ............................................................................ 2

STATEMENT OF THE CASE ............................................................................. 3

STATEMENT OF FACTS .................................................................................. 4

I.   LEGAL REQUIREMENTS REGARDING SEPARATION FROM ACTIVE
     SERVICE DUE TO MEDICAL DISABILITY .................................................. 4

     A.   Procedural Requirements ................................................................ 4

     B.   The Disability Separation Process ..................................................... 6

     C.   Types of Medical Discharges:  "Permanent Retirement," the "TDRL," and
          "Separation" ................................................................................ 7

II.  FACTUAL BACKGROUND:  SPC COOK'S SEPARATION FROM ACTIVE
     SERVICE DUE TO MEDICAL DISABILITY AND ONGOING MEDICAL
     EVALUATIONS .................................................................................... 9

     A.   SPC Cook's Military Service (2000–2007) ......................................... 9

     B.   SPC Cook's Separation From The Military (July 2007) ......................... 10

          i.    MEB Proceedings .................................................................. 10

          ii.   PEB Proceedings.................................................................. 11

     C.   SPC Cook's Medical Evaluations Following Discharge ........................ 12

          i.    First VA Rating Decision Resulting in a PTSD Rating of 50
                Percent (November 2007) ....................................................... 12

          ii.   Treatment at Reno VA Medical Center (February through
                November 2008) .................................................................. 13

          iii.  Second VA Rating Decision Resulting In an Increased PTSD
                Rating of 70 Percent (August 2009) ......................................... 14

          iv.   Treatment at Reno VA Medical Center (2011)............................. 15

     D.   SPC Cook's Life After Separation from the U.S. Army (Post July 2007 to
          Present) ..................................................................................... 15

     E.   PDBR Review and Decision of the Department of the Army ................. 18

STANDARD OF REVIEW ................................................................................ 19

ARGUMENT ................................................................................................ 20

# TABLE OF CONTENTS
## (continued)

Page

I.  SPC COOK IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD AS TO COUNT ONE BECAUSE THE ARMY FAILED TO COMPLY WITH VASRD 4.129 AND THEREFORE ACTED CONTRARY TO LAW ................................................................................................................ 20

    A.  The Army's Failure To Comply With VASRD 4.129 When Separating SPC Cook Due to PTSD Was Contrary to the Plain Language of Title 10 of the U.S. Code................................................................................................... 22

    B.  Binding Court Decisions Confirm that the Army's Failure to Provide a Minimum 50 Percent Disability Rating, as Specified in the VASRD, is Contrary to Law .................................................................................................. 23

    C.  The Army's Failure to Comply with VASRD 4.129 Violated Department Of Defense Instruction 1332.39.......................................................................... 27

    D.  Subsequent Legislative Hearings and Studies Further Confirm That the Army's Failure To Comply With VASRD 4.129 Was Contrary to Law............. 29

    E.  The Government's Argument that the Army's Actions in 2014 Renders Count One Moot Has No Merit ........................................................................... 33

    F.  SPC Cook Did Not Waive His Right to Judicial Review of the Army's 2007 Medical Separation Agreement.................................................................. 38

II.  SPC COOK IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD ON COUNT TWO  BECAUSE THE ARMY'S DECISION TO ADOPT THE MINORITY PDBR DETERMINATION IS ARBITRARY AND CAPRICIOUS, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND CONTRARY TO LAW ................................................................................................ 40

    A.  The Army Failed To Resolve Reasonable Doubt in SPC Cook's Favor or to Engage in De Novo Review, as Required by Law ........................................... 41

    B.  The Army Failed to Consider the Evidence in Light of the Legal Standard ....... 43

CONCLUSION.................................................................................................................... 49

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<span>ASES</span>

*Adams v. United States,*
    117 Fed. Cl. 628 (2014) ............................................................................... *passim*

*Andrews v. United States,*
    163 Ct. Cl. 126 (1963) ...........................................................................23, 24, 32, 33

*Asociación Colombiana de Exportadores de Flores v. United States,*
    916 F.2d 1571 (Fed. Cir. 1990)............................................................................40

*Beckham v. United States,*
    392 F.2d 619 (Ct. Cl. 1968) ................................................................................27

*Brown v. Gardner,*
    513 U.S. 115 (1994)............................................................................................43

*Chappell v. Wallace,*
    462 U.S. 296 (1983)............................................................................................19

*Christian v. United States,*
    337 F.3d 1338 (Fed. Cir. 2003).............................................................................34

*Colo. Dep't of Human Servs. v. United States,*
    74 Fed. Cl. 339 (2006) ........................................................................................40

*Corus v. United States,*
    502 F.3d 1370 (Fed. Cir. 2007)........................................................................39, 40

*Dilley v. Alexander,*
    603 F.2d 914 (D.C. Cir. 1979), *clarified by* 627 F.2d 407 (D. C. Cir. 1980) .........................34

*Dodson v. United States,*
    988 F.2d 1199 (Fed. Cir. 1993).............................................................................27

*Heisig v. United States,*
    719 F.2d 1153 (Fed. Cir. 1983).............................................................................20

*Hordechuck v. United States,*
    144 Ct. Cl. 492 (1959) ...........................................................................23, 24, 32, 33

*Jardon v. United States,*
    No. 10-738, 2013 U.S. Claims LEXIS 118 (Fed. Cl. 2013) ..................................39

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Martinez v. United States*,
    333 F.3d 1295 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1177 (2004)......................................19

*Mass. Bar Transp. Auth. v. United States*,
    129 F.3d 1226 (Fed. Cir. 1997)...........................................................................................34

*McHenry v. United States*,
    367 F.3d 1370 (Fed. Cir. 2004)................................................................................. *passim*

*Miss. Dep't of Rehab. Servs. v. United States*,
    61 Fed. Cl. 20 (2004) ..........................................................................................................19

*Mittal Steel Point Lisas Ltd. v. United States*,
    548 F.3d 1375 (Fed. Cir. 2008)......................................................................................39, 40

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................................. *passim*

*Petri v. United States*,
    104 Fed. Cl. 537 (2012) ................................................................................................32, 33

*Powell v. McCormack*,
    395 U.S. 486 (1969).............................................................................................................33

*Rice Servs. Ltd. v. United States*,
    405 F.3d 1017 (Fed. Cir. 2005)..........................................................................................33

*Rieth v. Unites States*,
    462 F.2d 530 (Ct. Cl. 1972) .........................................................................................26, 32

*Ryan v. United States*,
    71 Fed. Cl. 740 (2006) ........................................................................................................33

*Sabo v. United States*,
    No. 08–899 C (Fed. Cl., filed Dec. 17, 2008), 102 Fed. Cl. 619 (2011) ....................36, 37, 38

*Service v. Dulles*,
    354 U.S. 363 (1957).............................................................................................................27

*South Corp. v. United States*,
    690 F.2d 1368 (Fed. Cir. 1982)..........................................................................................24

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Stine v. United States*,
   92 Fed. Cl. 776 (2010) ....................................................................................27, 39

*Thompson v. United States*,
   195 Ct. Cl. 468 (1971) .......................................................................23, 25, 32, 33

*Towne v. United States*,
   106 Fed. Cl. 704 (2012) ............................................................................................19

*United States v. Gant*,
   63 Fed. Cl. 311 (2004) .............................................................................................39

*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952)...................................................................................................39

*Van Cleave v. United States*,
   70 Fed. Cl. 674 (2006) .............................................................................................20

*Verbeck v. United States*,
   97 Fed. Cl. 443 (2011) .............................................................................................20

*Walden v. United States*,
   24 Cl. Ct. 521 (1991) ...............................................................................................27

*Warner v. United States*,
   103 Fed. Cl. 408 (2012) ...........................................................................................39

*Williams v. United States*,
   100 Fed. Cl. 263 (2011) ...........................................................................................39

*Wolf v. United States*,
   168 Ct. Cl. 24 (1964) .........................................................................23, 24, 32, 33

**STATUTES AND REGULATIONS**

38 C.F.R.
   § 4.129............................................................................................ *passim*
   § 4.130...................................................................................................43, 44

5 U.S.C. § 706....................................................................................................19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

10 U.S.C.

§ 1201 ........................................................................................................ *passim*
§ 1201(a) ...................................................................................................................7
§ 1201(b)(3)(B) ........................................................................................................22
§ 1202 .......................................................................................................................7
§ 1203 ...............................................................................................................4, 7, 12
§ 1203(a) ...................................................................................................................7
§ 1203(b)(4) .............................................................................................................22
§ 1204(4)(B) .......................................................................................................22, 25
§ 1206(5) .................................................................................................................22
§ 1210(c) .................................................................................................................22
§ 1210(d) .................................................................................................................22
§ 1210(e) .................................................................................................................22
§ 1212(a) ............................................................................................................7, 12
§ 1214 .............................................................................................................5, 35, 36
§ 1216 .................................................................................................................27, 31
§ 1216(a) .............................................................................................................5, 31
§ 1554a .................................................................................................................3, 18

Army Regulation 635-40, *Personnel Separation:  Physical Evaluation for
    Retention, Retirement, or Separation* (Dep't of Army Feb. 8, 2006) ............................. *passim*

**RULES**

RCFC 52.1 ...................................................................................................................1

**OTHER AUTHORITIES**

Department of Defense Instruction 1332.38, *Physical Disability Evaluation*
    (Dep't of Defense Nov. 14, 1996) .................................................................... *passim*

Department of Defense Instruction 1332.39, *Application of the Veterans
    Administration Schedule for Rating Disabilities* (Dep't of Defense Nov. 14,
    1996) .............................................................................................27, 28, 29, 31

*Policy Memorandum on Implementing Disability-Related Provisions of the 2008
    NDAA* (Dep't of Defense Oct. 14, 2008) ..........................................................31, 41

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Hearing to Receive Testimony on the Department of Defense and Veterans Affairs*
*Disability Rating Systems and the Transition of Service Members from the*
*Department of Defense to the Department of Veterans Affairs*,
110th CONG., 1st SESS. (April 12, 2007)..........................................................................29, 30

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| Ronald C. Cook,                                          ) | |
|                                                          ) | |
|       Plaintiff,            ) | |
|                                                          ) | |
| v.                                                       ) | Civil Action No. 1:13-cv-00523 |
|                                                          ) | Judge Margaret M. Sweeney |
| United States of America,                                ) | |
|                                                          ) | |
|        Defendant.                ) | |
| _____ ) | |

**PLAINTIFF RONALD C. COOK'S CORRECTED MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT ONE OF THE AMENDED COMPLAINT, OR, IN THE ALTERNATIVE, MOTION JUDGMENT ON THE ADMINISTRATIVE RECORD**

Under Rule 52.1 of the Rules of the United States Court of Federal Claims, Plaintiff Ronald C. Cook respectfully requests that the Court grant judgment upon the administrative record and deny the Government's Motion to Dismiss Count One and for Judgment upon the Administrative Record. The Court should grant Specialist ("SPC") Cook judgment on the administrative record as to Count One and deny the Government's Motion to Dismiss because the Army should have applied Veterans Affairs Schedule for Rating Disabilities ("VASRD") section 4.129 at the time of SPC Cook's discharge. Failing to do so was contrary to law, and Count One is neither waived nor moot. In addition, the Court should grant SPC Cook judgment on the administrative record as to Count Two because the Army's adoption of the minority Physical Disability Board of Review ("PDBR") decision finding was not supported by substantial evidence and relied on inappropriate standards. The decision ignored relevant post-discharge evidence in the record and cherry-picked evidence from prior proceedings, selectively highlighting indications of SPC Cook's strength and disregarding evidence of SPC Cook's

struggle. Moreover, the decision failed to apply the appropriate legal standards, including the standard to resolve reasonable doubt in favor of the claimant.

## STATEMENT OF THE ISSUES

1. Whether, in determining the appropriate disability rating for SPC Cook's post-traumatic stress disorder ("PTSD") in 2007, the Army should have applied VASRD 4.129, which required a disability rating of at least 50 percent and either permanent disability retirement or placement on the Temporary Disability Retirement List ("TDRL") and entitlement to numerous procedural protections before the 50 percent rating could be reduced in the future.

2. Whether the Army's actions in 2014—which retroactively placed SPC Cook on the TDRL with a 50 percent rating for PTSD effective in 2007 and then retroactively reduced the 50 percent rating to 10 percent effective six months later, without providing SPC Cook with a contemporaneous medical examination or the right to a hearing and the other procedural protections guaranteed by Army regulations to a veteran placed on the TDRL—render Count One moot.

3. Whether SPC Cook waived his right to judicial review of the Army's 2007 medical separation decision.

4. Whether the Army's decision in 2014 to assign a permanent disability rating of 10 percent to SPC Cook was arbitrary and capricious, not supported by substantial evidence, or contrary to law.

## STATEMENT OF THE CASE

It is uncontested that SPC Ronald Cook developed post-traumatic stress disorder after exposure to the horrors of war.  He was correctly diagnosed with PTSD by the Army's Medical Evaluation Board ("MEB") in May 2007 and found unfit for military service by the Physical Evaluation Board ("PEB") on June 12, 2007.  Since that time, he has continued to suffer from PTSD, a condition which has affected all aspects of his life, personal and professional, even causing him to contemplate suicide.  On numerous occasions, agencies and review boards have found SPC Cook's PTSD to be debilitating, and, in fact, under current rules the law would have *mandated* that SPC Cook be afforded disability retirement with appropriate benefits from the Army.  Yet, the Army has, in a matter that is arbitrary, capricious, unsupported by the evidence, and contrary to law, denied SPC Cook those benefits.

In accordance with Title 10 § 1554a and in compliance with DoDI 6040.44, the Department of Defense's PDBR convened on March 20, 2014 to review SPC Cook's disability rating.  ARII-5 (Dept. of the Air Force Letter, dated Apr. 4, 2014).  The PDBR decision letter noted that, "[a]fter carefully reviewing the application and medical separation case file, by a majority vote, the PDBR recommended the records be corrected to reflect that upon separation the covered individual was placed on the Temporary Disability Retired List with a disability rating of 50% for a period of 6 months (VASRD 4.129); and upon final disposition permanent disability retirement with a combined disability rating of 30% rather than 10%."  *Id*.

On April 14, 2014, in a two-page document, the Department of the Army rejected the recommendation of the PDBR, instead summarily finding that SPC Cook was separated with a

permanent combined rating of 10 percent effective the day following the six month TDRL period.  ARII-1.

SPC Cook then filed this action.

Count One alleges that SPC Cook has been denied the disability retirement pay and benefits to which he is entitled under 10 U.S.C. § 1201 as a result of the Army's decision to disregard and circumvent 10 U.S.C. §§ 1201, 1203 and the VASRD.  In particular, the Army PEB's June 12, 2007 decision to assign a PTSD disability rating below 50 percent to SPC Cook when he was separated from the service, its initial failure to place him on the TDRL, its failure to provide him an examination within six months of his discharge, and its failure to afford him a subsequent medical examination and a PEB proceeding with all the associated procedural rights required for a full and fair hearing was arbitrary, capricious, and contrary to law.

Count Two alleges that the decision of the Army to reject the PDBR's majority recommendation to recharacterize Plaintiff's separation as a permanent retirement by assigning SPC Cook a PTSD disability rating of 30 percent at the six month mark following his discharge, despite substantial evidence in the record warranting such rating, was arbitrary, capricious, and contrary to law.

**STATEMENT OF FACTS**

I.  **LEGAL REQUIREMENTS REGARDING SEPARATION FROM ACTIVE SERVICE DUE TO MEDICAL DISABILITY**

A.  **Procedural Requirements**

Chapter 61 of Title 10 of the U.S. Code sets forth the standards under which the Armed Services may determine whether a service member may be retired or separated from service due to a medical disability, as well as the process the Armed Services must follow in the event that a

- 4 -

Service Branch finds an individual service member unfit for continued active service due to one or more medical disabilities. *See* 10 U.S.C. §§ 1201 *et seq.* These requirements are imposed directly on the Department of Defense ("DoD") and the individual Service Branches. *See* 10 U.S.C. § 1216(a). These agencies, in turn, have issued regulations implementing these statutory obligations. *See* DoDI 1332.38; Army Regulation 635-40.

One significant requirement imposed under Chapter 61 involves the individual service member's right to a "full and fair" hearing before a service member may be retired or separated due to medical disability. Specifically, 10 U.S.C. § 1214 provides, "No member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it."

In order to comply with this statutory requirement, DoD and the individual Service Branches have provided service members with certain due process and other procedural rights that attach throughout the disability determination process. *See*, *e.g.*, DoDI 1332.38. Among other things, before assignment of a disability rating for an unfitting condition, or before a disability rating assigned to a service member placed on the TDRL can be reduced, service members are entitled to numerous safeguards and protections, including the following:

- the right to a formal hearing and to appear personally at the formal hearing;
- the right to the appointment of free military counsel for representation at the formal hearing;
- the right to testify, to compel the attendance of witnesses at the hearing, and to submit other evidence regarding the service member's condition;
- the right of access to all records and information received at the formal PEB hearing that may affect the findings of the PEB or appellate review authority;
- the right to a written rationale explaining the findings and recommendations of the formal PEB; and
- the right to retain a previously-awarded disability rating that resulted in placement on the TDRL until that rating is changed by a PEB that affords the service member these procedural safeguards.

*See* DoDI 1332.38; Army Regulation 635-40.

**B.      The Disability Separation Process**

DoD and the individual Service Branches have issued regulations that incorporate and implement these statutory provisions and that specifically govern the process the Service Branches follow when retiring or separating a service member found unfit for continued military service due to a physical or mental disability.

Among other things, on November 14, 1996, DoD issued Instruction 1332.38, which it updated on July 1, 2006.  This DoDI sets forth the elements of the Armed Forces' Disability Evaluation System ("DES").  The DES consists of the following four elements: (1) An initial medical evaluation by a Medical Evaluation Board ("MEB") or a periodic medical re-examination for purposes of the TDRL; (2) A medical disability evaluation by a Physical Evaluation Board ("PEB"), to include appellate review; (3) Service member counseling; and (4) Final disposition by appropriate personnel authorities.  *Id.*

The initial medical evaluation that starts this process serves to identify a service member's medical condition and whether each such condition is cause for referral into the DES. If, based upon review of the medical examinations, the MEB determines the service member does not meet the Armed Forces' retention standards, the MEB will refer the service member to a PEB.  Army Regulation 635-40.

In turn, the PEBs evaluate the fitness of service members with medical impairments to perform their military duties and, for members determined unfit, their entitlement to benefits under Chapter 61 of Title 10 of the U.S. Code.  DoDI 1332.38; *see also* Army Regulation 635-40 ("The PEBs are established to evaluate all cases of physical disability equitably for the Soldier

and the Army.").  When doing so, the PEBs, in accordance with Chapter 61, must make certain determinations before permanently separating or permanently retiring a service member who has been found unfit.  At a minimum, these determinations include the following:  a determination whether the service member is unfit for continued military service; if so, a determination regarding the condition or conditions that render the service member unfit; the degree and corresponding rating percentage assigned to each unfitting condition; and the reason—if any— that any specific unfitting condition is not compensable under Chapter 61 of Title 10.  DoDI 1332.38.

       **C.**      **<u>Types of Medical Discharges:  "Permanent Retirement," the "TDRL," and "Separation"</u>**

       The disability rating given a service member found unfit for continued military service during the process described above determines whether a service member will be permanently "retired," temporarily "retired," or permanently "separated" from service.  Specifically, if the service member receives a disability rating of at least 30 percent under the VASRD, then the service member will be "retired" from the Armed Forces due to disability, either permanently or temporarily by placing the service member on the TDRL.  10 U.S.C. §§ 1201(a), 1202.  By contrast, if the service member's disability rating is less than 30 percent, then the service member will be permanently "separated" from the Armed Forces.  10 U.S.C. § 1203(a).  A "separated" service member receives only a lump-sum severance payment, and does not receive any of the ongoing medical or other privileges and benefits associated with military disability "retirement."  *See* 10 U.S.C. §§ 1203, 1212(a).

       The disability ratings assigned to a service member who is separated or permanently retired are permanent.  After the separation of such a service member from active service, the

assigned disability ratings are not periodically reviewed.  A service member will be placed on the

TDRL if he or she would qualify for permanent retirement under Section 1201(a) but-for the fact

that the service member's disability has not been "determined to be of a permanent nature and

stable."  *See* 10 U.S.C. § 1202.  A service member placed on the TDRL enjoys the same medical,

monetary, and other benefits while on the TDRL that a service member permanently retired from

military service receives upon discharge, except that the assigned disability ratings of a service

member placed on the TDRL are periodically reviewed.  *See* 10 U.S.C. §§ 1201, 1202.

While on the TDRL, the service member is subject to medical examinations every 18

months to determine whether the service member has experienced a change in the disability or

disabilities for which the individual was temporarily retired.  10 U.S.C. § 1210(a).  The service

member remains on the TDRL list until the particular Service Branch, after periodic re-

examination, makes a final determination regarding the service member's status.  10 U.S.C. §

1210.  The service member, however, may not be kept on the TDRL for more than 5 years.  At

that point, if the "physical disability for which the member's name was carried on the temporary

disability retired list still exists, it shall be considered to be of a permanent nature and stable."

*Id.* at § 1210(b).

Of particular importance to this litigation, the disability ratings assigned upon initial

placement on the TDRL cannot be reduced unless the service member is provided with both a

medical re-examination and a PEB proceeding with the same "full and fair hearing" procedural

rights and protections that the service member had upon separation from active service and

placement on the TDRL.  DoDI 1332.38; Army Regulation 635-40. Thus, a service member

cannot be removed from the TDRL and permanently separated with a reduced disability rating

- 8 -

unless he or she undergoes a periodic medical examination and is provided the same right to

trial-type procedural protections that the service member had in the proceeding that resulted in

placement on the TDRL. *Id.*

## II.  FACTUAL BACKGROUND: SPC COOK'S SEPARATION FROM ACTIVE SERVICE DUE TO MEDICAL DISABILITY AND ONGOING MEDICAL EVALUATIONS

### A.  SPC Cook's Military Service (2000–2007)

SPC Cook enlisted in the Army in May 2000 through the Service's Delayed Entry

Program when he was just seventeen years old.  ARI-223 through ARI-227.  Shortly after his

eighteenth birthday, SPC Cook began basic training at Fort Benning, Georgia, where he was

trained as an Automated Logistical Specialist.  *Id.*; ARI-4; ARI-9.  After completing his basic

training, SPC Cook underwent Advanced Individual Training in Fort Lee, Virginia, and served

two years thereafter in Hanau, Germany.  ARI-30; ARI-11.  In December 2002, SPC Cook was

transferred to Fort Carson in Colorado Springs.  *Id.*

SPC Cook's next stop was Iraq.  ARI-11.  The Army deployed SPC Cook to Iraq twice

for a combined total of 20 months: from April 2003 to February 2004 and again from February

2005 to February 2006.  *Id.*  During SPC Cook's first deployment, his unit played an integral role

in Operation Iraqi Freedom, securing multiple airfields and military complexes for later use by

coalition forces.  *See* ARII-36.  SPC Cook's second deployment brought him to Forward

Operating Base Falcon in Baghdad where his unit focused on providing security services.  *Id.*

During both tours in Iraq, SPC Cook was exposed to small arms and indirect fire and to

soldiers who had been severely injured or killed.  *See* ARI-15; ARI-28.  While death and injury

were constants through much of SPC Cook's deployments, the worst came in a five-week period

in mid-2005, when seven of SPC Cook's friends and fellow soldiers were killed in action.  *See*

ARI-12; ARI-15.  As his medical records document in detail, SPC Cook witnessed the deaths of

two fellow soldiers and learned the gruesome details of the deaths of two more.  *See* ARI-12;

ARI-15.  For example, SPC Cook was informed that a fellow soldier and friend, Sergeant Phelps,

was gravely injured in an explosion, losing both legs and one arm.  ARI-15.  Another friend,

Private First Class Swaney, was killed by decapitation when the vehicle he was traveling in

drove over an improvised explosive device that was placed underneath a road overpass.  ARII-

167; ARI-15.  SPC Cook remained in Iraq for another six months after these events.  *Id.*

SPC Cook struggled to return to the routine of daily life after his second deployment

ended.  *See* ARI-13; ARI-26 (Letter from Commander Captain James W. Otis, dated May 18,

2007).  He became distracted, irritable, and started showing symptoms of depression. *See id.* and

ARI-27 (Letter from Commander Lyndsey R. Nott, dated May 23, 2007).  About three months

after returning from Iraq, SPC Cook sought help for these and other emerging symptoms of

PTSD by scheduling an appointment with the Army Department of Behavioral Health ("DBH")

in June 2006.  ARI-15.  SPC Cook attended regular psychotherapy treatments through DBH for

about a year, but his condition did not improve.  *See* ARI-26.

>    **B.**    **SPC Cook's Separation From The Military (July 2007)**

>       i.    ***MEB Proceedings***

In May 2007, DBH referred SPC Cook to the Medical Evaluation Board.  ARI-11.  The

MEB's evaluation of SPC Cook resulted in diagnosis of PTSD and "major depressive episode,

recurrent," both of which were determined by the MEB to have originated in approximately 2006

and have been incurred by SPC Cook while on active duty in the U.S. Army.  *See* ARI-11

through ARI-16.  Documentation supporting the MEB diagnosis explained that "[i]t is clear that

[SPC Cook] suffers from both anxiety and depression," ARI-15, and described the following stressor events described by SPC Cook:

- On June 23, 2005, SPC Cook was told that Sergeant Phelps "got blown up and he lost one arm, both legs and he suffered greatly."
- On July 25, 2005, SPC Cook's friend, Private First Class Swaney "was blown up" and killed by the shrapnel from the explosion.
- On July 5, 2005, Sergeant Bright and Private First Class Cambridge were killed by an improvised explosive device. SPC Cook saw their corpses.

*Id.* The documentation supporting the MEB diagnosis also noted that SPC Cook reported experiencing "repeated disturbing memories, thoughts or images of stressful events; nightmares; feeling upset when something reminds him of the stressful military experience and having physical reactions when something reminds him of the stressful military experience." *Id.* Symptoms also included "avoidance of thoughts, conversations activities or situations that remind him of the stressful military event, anhedonia and feeling distant from other people; difficulty sleeping, irritability, hypervigilance and startle response [, and] feelings of depression, anhedonia, and loss of energy, decreased appetite and difficulty sleeping." *Id.* As a result of these findings, the MEB determined that SPC Cook's Major Depressive Disorder and PTSD made him "unfitting for military duty" and, on that basis, referred SPC Cook to the Physical Evaluation Board. ARI-1 through ARI-2; ARI-16.

        ii.     ***PEB Proceedings***

Following its evaluation of SPC Cook and review of the MEB's findings, the PEB determined that SPC Cook's PTSD merited a disability rating of 10 percent. ARI-2. On that basis, SPC Cook was medically separated from the Army effective July 30, 2007. *See* ARI-181 (Dept. of the Army Orders 197-0007, dated July 16, 2007).

- 11 -

The medical separation entitled SPC Cook to a one-time severance payment of $28,879.20.  ARII-15 (DD Form 214, dated Aug. 16, 2007).  It did not entitle him to the benefits he would have received had he been medically retired from the service, as is automatic if a service member is assigned a disability rating of 30 percent or greater.  *See* 10 U.S.C. §§ 1203, 1212(a).  This means (i) SPC Cook is denied monthly disability retirement payments for the rest of his life; (ii) SPC Cook's family cannot obtain health insurance through the military's Tricare program (as a veteran, SPC Cook himself can be treated at the VA); and (iii) SPC Cook had to surrender his military ID, meaning he cannot, among other things, take advantage of military commissary privileges.

### C.   SPC Cook's Medical Evaluations Following Discharge

Since the onset of his PTSD symptoms in 2006, SPC Cook has been regularly treated and observed by medical personnel.  This medical evaluation and treatment continued following SPC Cook's discharge from the Army in July 2007.  This section describes these treatments and the conclusions of the doctors and other professionals who have treated or evaluated SPC Cook over the past seven years.

i.   *First VA Rating Decision Resulting in a PTSD Rating of 50 Percent (November 2007)*

Approximately four months after his discharge from the U.S. Army, SPC Cook received his first rating decision from the U.S. Department of Veterans Affairs.  ARII-55 (VA Rating Decision, dated Nov. 26, 2007).  The VA determined that SPC Cook suffered from service-connected "PTSD with insomnia and depression" and assigned SPC Cook a rating of 50 percent for the disability, effective July 31, 2007, the date after SPC Cook's discharge from the Army.  *Id.*  In particular, the VA noted that its rating decision was based upon factors that included SPC

Cook's service treatment records showing "a diagnosis of PTSD with insomnia and depression due to [SPC Cook's] experiences in Iraq including the loss of seven friends." ARII-57 (VA Rating Decision, dated Nov. 26, 2007). In addition, the VA indicated that it assigned its 50 percent rating decision on the basis of 38 C.F.R. § 4.129 (discussed in more detail below).

        ii.    ***Treatment at Reno VA Medical Center (February through November 2008)***

In 2008, SPC Cook sought outpatient treatment for his PTSD at the VA. ARII-67. Beginning in February 2008, approximately six to seven months following his discharge from the Army, and through October 2008, SPC Cook had four face-to-face meetings with the PTSD Clinical Team at the VA Medical Center in Reno. *Id.*

Additionally, SPC Cook's Individual Treatment Plan at the VA, dated February 2, 2011, describes a November 2008 phone call received by the VA from SPC Cook. ARII-226. It states: "MHC 11/2008: Veteran phoned Wally Lewis, RN yesterday and was having suicidal thoughts, depression, physical and emotional abuse towards wife (x 2 yrs 'on and off'), arguing w/wife, unhappy w/job . . . . Vet endorsed the following chief complaints: 'Suicidal thoughts', 'Mood swings', and 'Depressed mood'." *Id.*

Though SPC Cook was treated at the VA several times in 2008, he missed scheduled reexaminations in November and December of that year. *See* ARII-80. As a result, in early 2009, the VA contemplated reducing his disability rating to 30 percent. *Id.* SPC Cook had moved residences shortly before the notice was sent and the VA did not have his new address on file. ARII-23. When the VA reached him by phone, he responded promptly and arranged for a re-examination. *Id.*; ARII-354.

- 13 -

   iii.   ***Second VA Rating Decision Resulting in an Increased PTSD Rating of 70 Percent (August 2009)***

   The VA performed a compensation and pension examination for SPC Cook on May 21, 2009.[1]  Upon evaluation of SPC Cook's condition, the VA doctor confirmed SPC Cook's diagnosis of "moderate to severe" PTSD that "made it difficult for him to socialize, interact with others, concentrate, sleep, manage his emotions, and connect with others."  ARII-75.  The diagnosis confirmed the significant impact the PTSD was having on SPC Cook's life in the year following his discharge:

> Veteran's employment has been impacted by his difficulty with authority and following rules.  He has acted in aggressive ways at work and has assaulted others at work.  He also reported getting angry at people that ask him for help or directions within his place of employment.  His performance at school is strained by his distress and he has a difficult time concentrating and does not feel like he "fits in" and feels like an "outcast."  He is not interested in socializing and interacting with others at school.  Veteran reported that he used to be close with his family, but since returning from Iraq, he has pushed people/family out of his life.  He has gotten into physical fights with his father and with his girlfriend.  Veteran reported that he has occasional homicidal ideation regarding his father; veteran explained that this is completely unlike [how] he used to be and he does not understand why he is able to have such thoughts.  Veteran does not socialize with others and prefers to be alone.  Although he used to be outgoing and sociable, he now described himself as like a "recluse" and "introverted."  He is only interested in activities that do not involve people (e.g., walking his dogs).  He stated that he would not work if he did not need the money and would move away to where people did not know him so that he could avoid others.  He used to like many activities, but now has a hard time seeing the point in these activities.  Veteran is so distressed by how his life has change[d] that he has considered suicide and had described some plans, but denied specific intent today.

ARII-76.

---

[1] The Administrative Record reflects that this examination occurred on December 4, 2008.  ARII-75.  However, that date was entered erroneously.  The date on which this examination actually occurred was May 21, 2009.  ARII-90.

As a result of the examination performed on May 21, 2009, the VA increased SPC

Cook's PTSD disability rating from 50 percent to 70 percent in a rating decision dated August 6,

2009.  *See* ARII-353.  Based on its examination and records from SPC Cook's treatment, the VA

assigned the increased rating due to the significant impact of SPC Cook's disability on his

occupational and social functioning.  ARII-355.  The VA evaluation report explained:

> You feel emotionally and psychologically distanced from others, "like an
> outcast." The examiner assigned a Global Assessment of Function (GAF) score of
> 53 due to your PTSD symptoms. You reported you are so distressed by how your
> life has changed that you have considered suicide and have described some plans,
> but denied specific intent at the time of the interview. An evaluation of 70 percent
> is assigned for occupational and social impairment, with deficiencies in most
> areas, such as work, school, family relations, judgment, thinking, or mood, due to
> such symptoms as: suicidal ideation; obsessional rituals which interfere with
> routine activities; speech intermittently illogical, obscure, or irrelevant; near
> continuous panic or depression affecting the ability to function independently,
> appropriately and effectively; impaired impulse control (such as unprovoked
> irritability with periods of violence); spatial disorientation; neglect of personal
> appearance and hygiene; difficulty in adapting to stressful circumstances
> (including work or a worklike setting); inability to establish and maintain
> effective relationships.

*Id.*

#### iv.     *Treatment at Reno VA Medical Center (2011)*

Following a domestic dispute with his wife and resulting criminal charges against SPC

Cook, SPC Cook was admitted to a veteran's hospital two times within the span of two weeks

between March and April 2011.  ARII-97 through ARII-136.  In SPC Cook's file for his April

2011 admission, it was noted that SPC Cook exhibited signs of "severe and persistent mental

illness which includes, but is not limited to:  . . . severe PTSD."  ARII-101.

### D.     SPC Cook's Life After Separation from the US. Army (Post July 2007– Present)

SPC Cook settled in Reno, Nevada after discharge, near his family and close to

classmates and others he had known before enlisting.  ARII-20.  He enrolled at the University of

Phoenix and obtained a job as a member of the security team at Harrah's casino in Reno.  ARII-41.  But the return to normalcy was at most superficial and fleeting.  ARII-41 through ARII-42.

His relationships suffered.  ARII-42.  Though he and his father had been close before his enlistment in the Army, they clashed repeatedly in the first two years after his discharge.  ARII-43.  SPC Cook, never a violent person, found himself at times contemplating physical violence against his father.  *Id*.  By January 2008—less than six months after SPC Cook's discharge—father and son were no longer talking, and they would not speak for the next four years.  *Id*.

SPC Cook's relationship with his then-girlfriend (and future wife) was similarly fraught.  ARII-42.  They fought often.  *Id*.  In the fall of 2008—about a year after his discharge—police were called to mediate a fight.  ARII-68.  Though no charges were filed, the incident left SPC Cook frightened of himself and his temper.  *See id*.  He reported in November 2008 that he had been physically and emotionally abusive to his wife "on and off" for two years.  ARII-226.  Things were no better outside the family.  *See* ARII-69.  Once outgoing and with many friends, SPC Cook withdrew into himself and had no social life.  *See id*.; ARII-42.

His quality of life suffered.  *See* ARII-42.  He could not sleep for more than a couple hours at a time, waking frequently in a state of hypervigilance.  *Id*.  He had nightmares when asleep and was anxious and angry when awake.  *Id*.  He thought of suicide.  *Id*.  He had occasional auditory hallucinations recalling the violent death of his friends.  *Id*.

His work suffered.  *See* ARII-41.  He found it hard to concentrate and his work efforts were frequently interrupted by anxiety and hallucinations.  ARII-42.  He was often angry at co-workers and customers.  ARII-41.  Supervisors reprimanded him for using excessive force.  *See id*.  In several instances, he was brought in for one-on-one discussions about the need to avoid

violence.  ARII-21.  At the time, SPC Cook saw violence as an outlet; the ability (however legally constrained) to rough up recalcitrant customers a perk of the job.  *Id*.  But he recognized that the violence was not good for him.  *Id*.

Although SPC Cook had been promoted about six months after starting at Harrah's, by July 2010, he was out of a job.  *Id*.; ARII-41.  SPC Cook began to receive unemployment assistance and did not work for several months, a period that left him feeling miserable.  ARII-21.  He did eventually find a new job in November, as a member of the security team at a different casino.  *Id.*; ARII-41.  It would take SPC Cook another six months at the new casino before he regained the position he had had at Harrah's.  ARII-21.

SPC Cook married in March 2010.  *Id*.  Their relationship remained stormy.  *See id*.  It reached a nadir in March 2011 in a fight that led once more to police involvement.  ARII-42.  This was a "wake up call" for SPC Cook, the low point in several difficult years.  *See id*.  During the incident, he fought his wife and made efforts to choke her.  *Id*.  In the struggle, he saw blood on her.  *Id*.  The image shocked him and he turned the violence on himself, putting a robe belt around his neck in an attempt to asphyxiate himself.  *Id*.  His wife called 911.  *See id*.  When the police arrived, SPC Cook asked them to take him to jail, recognizing immediately that he had been wrong.  *Id*.  He was arrested for the first time.  *Id*.  In jail, SPC Cook was put on suicide watch.  *Id*.  He was charged with a felony and two misdemeanors.  ARII-42 through ARII-43.  He would eventually plead guilty to misdemeanor domestic battery, for which he served two days in jail, performed 24 hours of community service, and participated in six months of anger management.  ARII-43.

Since his separation from the U.S. Army, SPC Cook has been prescribed numerous medications to treat symptoms related to his PTSD including: Prazosin for nightmares, Mirtazapine for insomnia, and Valproic Acid for mood stabilization, among others. ARII-44.

**E.    PDBR Review and Decision of the Department of the Army**

In accordance with Title 10 § 1554a and in compliance with DoDI 6040.44, the Department of Defense's Physical Disability Board of Review ("PDBR") convened on March 20, 2014, to review SPC Cook's disability rating. ARII-5 (Dept. of the Air Force Letter, dated Apr. 4, 2014). The PDBR "recommended the records be corrected to reflect that upon separation the covered individual was placed on the Temporary Disability Retired List with a disability rating of 50% for a period of 6 months (VASRD 4.129); and upon final disposition permanent disability retirement with a combined disability rating of 30% rather than 10%." *Id.*

In arriving at its decision to recommend a 50 percent temporary rating for the six months following SPC Cook's discharge from the U.S. Army and a 30 percent permanent disability rating, the PDBR considered facts that were identified in the MEB materials as having had a traumatic effect on SPC Cook and that gave rise to the PTSD suffered by SPC Cook. ARII-7. On April 14, 2014, in a two-page document, the Department of the Army rejected the recommendation of the PDBR, instead summarily adopting the minority opinion from the PDBR and finding that SPC Cook was separated with a permanent combined rating of 10 percent effective the day following the six month TDRL period. ARII-1 (Dept. of the Army letter, dated Apr. 14, 2014).

- 18 -

## STANDARD OF REVIEW

In general, the Court reviews a decision of the Secretary of the Army to determine whether it "is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." *Martinez v. United States*, 333 F.3d 1295, 1314 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1177 (2004); *see also Chappell v. Wallace*, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence.").

Courts review an agency's interpretation of a regulation as a question of law, and award deference to the agency's interpretation only if it is a valid interpretation.  *See* 5 U.S.C. § 706 ("[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."); *Towne v. United States*, 106 Fed. Cl. 704, 712 (2012) ("The DoD's interpretation is only entitled to deference if it is within the range of acceptable meanings of 'combat-related operations,' as those words can be understood using ordinary rules of statutory construction."); *Miss. Dep't of Rehab. Servs. v. United States*, 61 Fed. Cl. 20, 24 (2004) ("As the reviewing Court, we 'decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.'" (quoting 5 U.S.C. § 706).  A decision by the Secretary of the Army that relied on an improper reading of a statute, regulation, or relevant, binding case law would be arbitrary, capricious, and contrary to law. *See* 5 U.S.C. § 706; *Towne v. United States*, 106 Fed. Cl. at 712.

As this Court recently recognized, the Court "must satisfy itself that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the

facts and circumstances pertinent to the case before it." *Adams v. United States*, 117 Fed. Cl.

628, 653 (2014) (quoting *Verbeck v. United States*, 97 Fed. Cl. 443, 451 (2011); citing *Heisig v.*

*United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983) ("Under the substantial evidence rule, all of

the competent evidence must be considered, whether original or supplemental, and whether or

not it supports the challenged conclusion."); *Van Cleave v. United States*, 70 Fed. Cl. 674, 678–

79 (2006) (While the court does not "serve as a 'super correction board,' correction boards must

examine relevant data and articulate satisfactory explanations for their decisions." (internal

citations omitted)).   "If the Board 'entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the [Board,] or is

so implausible that it could not be ascribed to a difference in view or the product of agency

expertise,' its decision runs afoul of even this lenient standard of review." *Adams*, 117 Fed. Cl.

at 654 (modification in original) (quoting *Verbeck*, 97 Fed. Cl.  at 451 (quoting *Motor Vehicle*

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

<u>**ARGUMENT**</u>

**I.**     <u>**SPC COOK IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE**
**RECORD AS TO COUNT ONE BECAUSE THE ARMY FAILED TO COMPLY**
**WITH VASRD 4.129 AND THEREFORE ACTED CONTRARY TO LAW**</u>

It is undisputed that in 2007, the Army Physical Evaluation Board ("PEB") determined

that (a) SPC Cook was unfit to continue active duty service due to the PTSD he developed as a

direct result of his military service in the Army and (b) his PTSD should be assigned a 10 percent

disability rating.  As a result, SPC Cook was medically separated and denied military disability

retirement.

We demonstrate below that the Army PEB acted contrary to law.

- 20 -

Chapter 61 of Title 10, U.S.C. required the Military Services, including the Army, to use the criteria set forth in 38 C.F.R. Part 4 (known as the VA Schedule for Rating Disabilities or "VASRD") in determining the appropriate rating to assign to a condition that renders the service member unfit for continued active duty service.  VASRD 4.129 (38 C.F.R. § 4.129) addresses mental disorders that are due to traumatic stress and lead to release from active service, and spells out the specific disability rating to be assigned to veterans who are released due to such service-related mental disorders.  Specifically, VASRD 4.129 states:

> When a mental disorder that develops in service as a result of a highly stressful event is severe enough to bring about a veteran's release from active military service, *the rating agency shall assign an evaluation of not less than 50 percent and schedule an examination within the six month period following the veteran's discharge* to determine whether a change in evaluation is warranted.

VASRD 4.129 (emphasis added).

The government does not contest SPC's Cook's argument that if VASRD 4.129 applied to the Army PEB in 2007, the Army PEB would have been required to assign SPC Cook at least a 50 percent rating for his PTSD, rather than the assigned 10 percent rating, and that a 50 percent rating would have entitled SPC Cook to military disability retirement benefits.  The government's argument is that in 2007, the Army PEB was required to ignore VASRD 4.129 pursuant to Army policy, which provided that VASRD 4.129 "is essentially a convalescent rating and will not be used."  Def. Mot. at 24.

As we demonstrate below, the government's argument has no merit for two independent reasons.  The Army's policy instructing Army PEBs not to apply VASRD 4.129 violated (1) Chapter 61 of Title, 10 U.S.C. and (2) the Department of Defense Instruction that governed the disability rating criteria in 2007.

- 21 -

A.   **The Army's Failure To Comply With VASRD 4.129 When Separating SPC Cook Due to PTSD Was Contrary To The Plain Language of Title 10 of the U.S. Code**

SPC Cook's entitlement to application of VASRD 4.129 derives directly from the governing statutes and the controlling case law.  Specifically, Sections 1201 to 1221 of Title 10 set forth the standards and process under which the Service Branches may determine whether a service member should be permanently retired, temporarily retired (*i.e.*, placed on the TDRL), or separated from service due to a medical disability.  *See* 10 U.S.C. §§ 1201–21.  Section 1201 addresses the conditions surrounding permanent retirement from the military, and provides that the Service Branches may permanently retire a service member under certain conditions, including a requirement that the service member have a disability that renders the member unfit for further military service, and that "disability is at least 30 percent under the standard schedule for rating disabilities in use by the Department of Veteran Affairs at the time of the determination."  10 U.S.C. § 1201(b)(3)(B).  The statutory provisions governing temporary retirement and medical separation use this same language in describing the criteria that must be used in setting the disability rating percentage.  *See* 10 U.S.C. § 1203(b)(4) (disability determinations resulting in separation from service); § 1204(4)(B) (disability determinations for members on active duty for 30 days or less resulting in retirement); § 1206(5) (disability determinations for members on active duty for 30 days or less resulting in separation from service); § 1210(c), (d), (e) (disability determinations while on temporary disability retired list).  Under the plain language of these longstanding provisions, Congress required the Service Branches to rate disabilities under the VASRD when making such determinations.  The language used is unequivocal.  No part of the language used by Congress indicated that the military

- 22 -

services could vary from the VASRD.

**B.     Binding Court Decisions Confirm That The Army's Failure To Provide A Minimum 50 Percent Disability Rating, As Specified In The VASRD, Is Contrary To Law**

Since 1959, the federal courts consistently have held that, under 10 U.S.C. § 1201 (and its related and predecessor statutes), the military service branches are required to follow the VASRD when determining whether a service member should be "retired" from service due to a medical disability. *See Hordechuck v. United States*, 144 Ct. Cl. 492, 496 (1959); *Andrews v. United States*, 163 Ct. Cl. 126 (1963); *Wolf v. United States*, 168 Ct. Cl. 24, 31–32 (1964); *Thompson v. United States*, 195 Ct. Cl. 468, 477 (1971); *McHenry v. United States*, 367 F.3d 1370, 1378–70 (Fed. Cir. 2004).

The first decision that applied this rule, *Hordechuck*, involved a claim by a service member found unfit for duty by a PEB because of a "'prolapsed rectum, persistent,' of a moderate degree of severity . . . ." 144 Ct. Cl. at 494. The then-applicable VASRD for this condition required a disability rating of at least 30 percent. Notwithstanding that, the Army Physical Disability Appeal Board ("APDAB") issued the service member a rating of only 10 percent for a separate condition related to the impairment of sphincter control. *Id*. at 495.

The Court of Claims concluded that the APDAB's assignment of a lower rating violated the Career Compensation Act (the precursor statute to the present Section 1201). Specifically, the Court held that the APDAB's actions were:

> unauthorized because the [VASRD] states . . . that in the case of a prolapsed rectum, persistent, moderate, the lowest percentage of disability to be assigned is 30%. In other words, if a member of service is to be diagnosed as having such a condition he must be rated under [the proper VASRD Code provision], and because that Code carries a minimum percentage of 30 percent the individual automatically becomes eligible for retirement under the Career Compensation

- 23 -

Act.  The [VASRD] contains no authority for reducing percentages beyond those found in the schedule itself.

*Id*. at 496; *see also Andrews*, 163 Ct. Cl. 126 at 133 (finding that APDAB misapplied, "misinterpreted and acted contrary to the governing Diagnostic Code" in assigning rating lower than that specified in VASRD.)

In *Wolf*, the Court of Claims expanded the *Hordechuck* rule to cover cases involving strict adherence to the VASRD in setting two or more disability ratings where the service member has more than one unfitting condition.  The service member in *Wolf* claimed he was entitled to separate ratings totaling 70 percent under the VASRD stemming from the resection of his small intestine and the resection of his large intestine, and that the PEB had acted unlawfully when it awarded him only a 20 percent rating for both these conditions.  168 Ct. Cl. at 25, 30. The Government argued that awarding a combined rating under the VASRD amounted to "pyramiding," which the VASRD prohibits.  168 Ct. Cl. at 30–31.  The Court disagreed, holding that "when a member of the military service is diagnosed as having a condition described in the [VASRD], and the code for that condition carries with it 'a minimum percentage' rating, the member is automatically entitled to at least that rating, there being no authority for reducing percentages beyond those found in the schedule itself."  *Wolf*, 168 Ct. Cl. at 31–32.  The above-cited decisions of the Court of Claims—a predecessor court of the Federal Circuit—are binding precedent in the Federal Circuit, (*South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982)).

In *McHenry*, the Federal Circuit held that, while the VASRD served as a floor from which the military could not deviate, the military could assess higher ratings than set forth in the schedule.  *See* 367 F.3d at 1370.  *McHenry* involved a service member who claimed he was due

- 24 -

a 100 percent rating for HIV, which was the established rating for HIV before its revocation by

the Secretary of Navy while the service member's PEB was pending.  A second Navy directive

that remained in effect through the service member's PEB required the PEB to follow the

VASRD in assigning a disability rating, but that in no instance would a service member found

unfit due to HIV receive a rating less than 30 percent.  *Id.* at 1374–75.

Under this guidance, the service member was retired with a 30 percent disability rating,

and the Federal Circuit found that the Navy had not acted arbitrarily, capriciously, or otherwise

contrary to law in assigning the service member the 30 percent rating.  In doing so, the Federal

Circuit held that, under its precedents, though the military could not assign a disability rating less

than what was specified in the VASRD, the military could assign a higher rating.  The Court

stated:

> The statute mandating the creation of the VASRD requires only the Secretary of
> Veterans Affairs to apply the guidelines, but 10 U.S.C.  § 1201 requires that
> disability ratings by the Secretary of the pertinent military department be based on
> the VASRD schedule.  Section 1201 provides: "Determinations [that a service
> member is unfit for duty because of a physical disability] are determinations by
> the Secretary that . . . the disability is at least 30 percent *under the standard
> schedule of rating disabilities in use by the Department of Veterans Affairs at the
> time of the determination*" . . . .  Section 1204(4)(B), involving disability
> retirement for service members not covered by section 1201, similarly requires
> that disability ratings be based on the VASRD schedule, using the same language
> as section 1201. . . .  In *Thompson v. United States*, our predecessor court held
> that section 1204(4)(B) requires the Secretary to apply the VASRD in rating
> disabilities.  The court also noted that the statute "requires by specific reference,
> that the rating of disability be made 'under the standard schedule of rating
> disabilities in use by the Veterans Administration.' . . . There [is] no authority for
> reducing percentages beyond those found in the schedule itself" . . . Although the
> armed forces must use the VASRD guidelines when the service member's
> disabilities "come within" them, the Secretary may make *upward* departures from
> the VASRD guidelines in particular cases.

367 F.3d at 1378–79 (citations omitted) (emphasis in original); *see also Thompson v. United*

- 25 -

*States*, 195 Ct. Cl. 468, 477 (1971) (Federal law "requires by specific reference, that the rating of disability be made 'under the standard schedule of rating disabilities in use by the Veterans Administration'") (citations omitted).

Finally, in *Rieth v. Unites States*, 462 F.2d 530, 537 (Ct. Cl. 1972), the former Court of Claims confronted a similar situation involving the Armed Service's failure to assign a minimum rating specified in the VASRD.  Specifically, in *Rieth*, the court found that the plaintiff was entitled to a minimum rating of 10 percent under the VASRD for a shoulder injury that, when combined with a 20 percent rating he previously had received, would have entitled him to disability retirement pay for a 30 percent disability.  As the court recognized, where the VASRD mandates a minimum rating, the rating given a service member "must be no less than [that] minimum."  462 F.2d at 535.  Accordingly, and in "wholesome recognition of the shortness of life, the natural preference to reward a deserving suitor rather than eventually his estate, and the need to find the shortest distance between wrong and redress," the court simply ordered that the plaintiff receive what was mandated under the VASRD on the "legal grounds of a procedural omission which unjustly deprives plaintiff of his deserts."  *Id.* at 537.

As these cases confirm, the controlling law required the Army to apply the VASRD, which includes VASRD 4.129, in assigning a disability rating to SPC Cook's PTSD and prohibited the Army from deviating from the strict and literal application of VASRD 4.129 when the Army separated SPC Cook from active service due to PTSD.  In this case, there can be no dispute that the Army failed to comply with VASRD 4.129 when terminating the active service of SPC Cook.  Accordingly, the Army's failure to comply with 4.129 and assign SPC Cook a disability rating of 50 percent effective the date of separation was directly contrary to law.  *See*

*Stine v. United States*, 92 Fed. Cl. 776, 791 (2010) (to prevail, plaintiff must show that "'the

action of the military is arbitrary, capricious, unsupported by substantial evidence or contrary to

applicable statute or regulations'") (citations omitted); *Walden v. United States*, 24 Cl. Ct. 521,

531 (1991).

      C.      **The Army's Failure To Comply With VASRD 4.129 Violated Department Of Defense Instruction 1332.39**

Even assuming for the moment (and contrary to all of the above) that the Army's failure

to comply with VASRD 4.129 did not violate the controlling statutes and the controlling case

law, the Army would still be required to overcome an additional hurdle regarding its lack of

compliance with an applicable DoD Directive, which it cannot do.  In particular, pursuant to 10

U.S.C. § 1216, the Secretary of Defense issued a directive in 1996, DoDI 1332.39, which

required that in most cases the VASRD would be used as the standard for assigning percentage

ratings in disability cases.  Thus, even if the Army had *statutory* authority to deviate from

VASRD 4.129 (which, as described above, it did not), the Army would *still* have to demonstrate

that DoDI 1332.39 authorized the Military Services to deviate from VASRD 4.129.  *See Dodson*

*v. United States*, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (although DoD not required to

promulgate regulations, "having done so [it] is bound to follow them") (citations omitted);

*Beckham v. United States*, 392 F.2d 619, 622 (Ct. Cl. 1968) (noting that "the Navy Board, like

other administrative bodies, is bound by its own regulations."); *see also Service v. Dulles*, 354

U.S. 363, 388  (1957) (noting that, though Secretary of State was "not obligated to impose upon

himself . . . more rigorous substantive and procedural standards [required under the McCarran

Act], neither was he prohibited from doing so,  . . . and having done so he could not, so long as

the Regulations remained unchanged, proceed with regard to them.")

As the government admits, DoDI 1332.39 "provides for the military 'primarily' to use the VASRD."  Def. Mot. at 23.  Paragraph 4.1 of the DoDI expressly states that "the VASRD is applicable except those portions that . . . *are specifically identified in Enclosure 2 as being inapplicable*."  DoDI 1332.39, ¶ 4.1 (emphasis added).  What the government does not mention, however, is that Enclosure 2 does not even refer to VASRD 4.129, much less "specifically identify" it as "being inapplicable."  This alone dooms the government's argument that the Army's guidance instructing the Army PEB not to apply VASRD 4.129 is consistent with the governing DoDI.

The government seeks refuge in ¶ 6.7 of the DoDI, entitled "Convalescent Ratings."  *See* Def. Mot. at 24.  Paragraph 6.7 provides that "Convalescent Ratings" do not apply to the military services.  But the government's suggestion that VASRD 4.129 is a "Convalescent Rating" has no merit.  The parts of the VASRD that qualify as a "Convalescent Rating" are labeled by VA as such.  There are two parts of the VASRD that are specifically identified by VA as Convalescent Ratings.  First, VASRD 4.30, entitled "Convalescent Ratings," requires assignment of a 100 percent rating if treatment of the disability resulted in surgery necessitating at least one month of convalescence, surgery with severe postoperative residuals or immobilization by cast without surgery of one major joint or more.  Second, under the part of the VASRD devoted to "MENTAL DISORDERS," is VASRD 4.128, which is entitled "Convalescence Ratings Following Extended Hospitalization."  This regulation provides that if a mental disorder has been assigned a 100 percent rating due to a continuous period of hospitalization, the rating agency shall continue the 100 percent rating indefinitely and schedule a medical examination six months after the veteran is discharged from the hospital.

The part of the VASRD at issue in this case, VASRD 4.129, follows directly after VASRD 4.128 ("Convalescence Ratings Following Extended Hospitalization").  In contrast to VASRD 4.128, 4.129 is entitled "Mental Disorders Due to Traumatic Stress."  The flaw in the government's reliance on the DoDI exemption for Convalescent Ratings is that not one word of VASRD 4.129 states that it qualifies as a Convalescent Rating.  Because DoDI 1332.39 required the Army to strictly comply with the VASRD except for portions of the VASRD "specifically identified" in the DoDI "as being inapplicable," and because VASRD 4.129 was not specifically identified in the DoDI as being inapplicable, the Army's instructions to the Army PEB to ignore VASRD 4.129 in SPC Cooks's case violated this binding Department of Defense Instruction.

**D.      Subsequent Legislative Hearings and Studies Further Confirm That The Army's Failure To Comply With VASRD 4.129 Was Contrary to Law**

Shortly before the Army PEB considered SPC Cook's case in 2007, the Senate Committees for Armed Serviced and Veterans Affairs conducted a joint hearing to address the inconsistencies between the application of the VASRD by the military services and the VA.  *See Hearing to Receive Testimony on the Department of Defense and Veterans Affairs Disability Rating Systems and the Transition of Service Members from the Department of Defense to the Department of Veterans Affairs*, 110th CONG., 1st SESS. (April 12, 2007) ("2007 Hearing").  As this Court recently recognized in *Adams*, 117 Fed. Cl. at 669, "the Department of Defense admitted [at the hearing] that the military's [disability] rating system was flawed" (citing the testimony of Deputy Secretary of Defense Gordon England that "it is evident that some of our valued servicemen and women, and particularly those with war injuries, *are not receiving the level of care [benefits] they deserve*."  2007 Hearing at 13 (emphasis added)).

The Court additionally discussed a study prepared by the Center for Naval Analysis, and discussed at the 2007 hearing, which "indicated that the military, across all branches, consistently rated service members significantly lower than the VA." *Adams*, 117 Fed. Cl. at 665. The Court went on to quote testimony from General James Terry Scott, Chairman of the Veterans' Disability Benefits Commission: "*It is also apparent that DoD has strong incentive to assign ratings less than 30% so that only separation pay is required and continuing family health care is not provided.*" *Adams*, 117 Fed. Cl. at 665–66 (emphasis added) (quoting 2007 Hearing at 133).

The Commission's study analyzed the DoD and VA disability ratings assigned to the same individual for 13 of the most commonly diagnosed medical conditions and concluded that "[o]f the thirteen individual diagnoses analyzed, the VA ratings were statistically significantly higher than all of the [military] [s]ervices for 8 diagnoses." 2007 Hearing at 103. According to the Commission's study, of the thousands of service members like SPC Cook for whom the PEBs assigned a disability rating for PTSD of less than 30 percent (*i.e.*, below the 30 percent threshold for entitlement to military disability retirement benefits), an extraordinary 87 percent of these same individuals received a disability rating of 30 percent to 100 percent for the same PTSD under the same VASRD. *Id*. at 103.

The Court concluded that "[t]he legislative history further indicates that Congress believed the military's ratings were 'unjustifiably low' specifically because the military's disability rating system was flawed." *Adams*, 117 Fed. Cl. at 669. The Court further noted that, at the 2007 Hearing, "Senator Levin described the lower military ratings . . . as 'just unfair,'" and "Senator John McCain, at the time Ranking Member of the Senate Committee on Armed

- 30 -

Services, . . . . remarked:  'There appears to be consensus . . . that the current decentralized

disability evaluation systems for the Army, Navy, Air Force, and Marines have received very

little oversight from DOD and have produced questionable outcomes for many severely wounded

soldiers." *Adams*, 117 Fed. Cl. at 666 (quoting 2007 Hearing at 6, 126).  The foregoing

legislative history further supports the proposition that the Army's policy to ignore VASRD

4.129 was contrary to the controlling statutes and DoDI 1332.39.

These hearings ultimately resulted in passage of the section 1642 of the Wounded

Warrior Act (codified at 10 U.S.C. §1216) in January 2008.  Finally, in October 2008, the

Department of Defense belatedly instructed the Army to cease violating VASRD 4.129.

Specifically, on October 14, 2008, DoD issued a Memorandum stating that:

> The Military Department Secretary concerned will abide by 10 U.S.C. 1216a and
> 38 CFR 4.129, VASRD for disposition of Service members found unfit because
> of a mental disorder due to traumatic stress.  When a mental disorder that
> develops on active duty as a result of a highly stressful event is severe enough to
> bring about the release from active military service, *the rating agency shall assign
> an evaluation of not less than 50%* and schedule an examination within the 6
> month period following discharge to determine whether a change in rating and
> disposition is warranted.  The disposition of Service members diagnosed with a
> mental disorder due to traumatic stress found to be an unfitting condition in the
> [Disability Evaluation System] will be as follows:
> E7.2.1  For members found unfit with a rating of 80% or greater for a permanent
> and stable condition (or conditions) not related to diagnosis of the mental disorder
> due to traumatic stress, the member will be permanently retired.
> E7.2.2  All other such members must be placed on the Temporary Disability
> Retirement List (TDRL) and re-evaluated within a timeframe that is not less than
> 90 days, but within 6 months, from the date of placement on the TDRL.

DoD October 14, 2008 Policy Memorandum at 19 (emphasis added).  Under this Policy

Memorandum, if a service member is placed on the TDRL with the minimum 50 percent

disability rating for PTSD, that 50 percent rating would continue in force unless and until the

veteran was provided a medical examination to assess the severity of his PTSD and the right to

all of the procedural safeguards that Army regulations require for veterans placed on the TDRL. To date, the Army has not provided SPC Cook with a post-discharge medical examination or any of the other procedural safeguards guaranteed by Army regulations.

In arguing that the Army was not required to apply VASRD 4.129, the government does not discuss the statutes requiring the Army to determine disability ratings "under the [VASRD]." Nor does the government discuss the binding judicial opinions in *McHenry*, *Rieth*, *Wolf*, *Andrews*, *Thompson*, and *Hordechuck*. Instead, the government relies upon this Court's nonbinding decision in *Petri v. United States*, 104 Fed. Cl. 537 (2012). Since *Petri* is not binding, it is relevant only for its persuasive value.

The part of *Petri* that the government relies upon states that "[c]ontrary to plaintiff's allegations, it appears that in 2006, the Air Force was not required, by regulation, to place plaintiff on the [TDRL] pursuant to [VASRD 4.129] before separating him from the Air Force in 2006. [VASRD 4.129] was not applied to the Department of Defense until 2008." 104 Fed. Cl. at 553 (citing the October 2008 DoD Memorandum). This Court's decision in *Petri* does not persuasively resolve Count One of SPC Cook's complaint for several reasons. First, in ruling that VASRD 4.129 did not apply to the Air Force in 2006, it appears that the Court relied upon the Air Force regulation that authorized the Air Force not to apply VASRD 4.129. The Court did not address whether the Air Force regulation itself violated higher authority, apparently because the plaintiff did not advance such an argument. Here, in contrast, SPC Cook directly challenges the Army policy instructing the Army PEB to ignore VASRD 4.129 on the ground that the policy directive is contrary to statute and the controlling DoD Directive—arguments that the Court never resolved in *Petri*.

- 32 -

In addition, the Court did not discuss the directly relevant and binding opinions in *McHenry*, *Rieth*, *Wolf*, *Thompson*, *Andrews*, and *Hordechuck*, apparently because the plaintiff in *Petri* did not rely upon these binding authorities.  Indeed, it does not appear that the Court was aware when it decided *Petri* in 2012 of the 2007 Hearing or the other legislative history it relied upon two years later in *Adams*.  Accordingly, *Petri* neither controls nor provides persuasive authority regarding the appropriate outcome of Count One.

**E.**   **The Government's Argument that the Army's Actions in 2014 Renders Count One Moot Has No Merit**

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Rice Servs. Ltd. v. United States*, 405 F.3d 1017, 1019 n.3 (Fed. Cir. 2005) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)); *Ryan v. United States*, 71 Fed. Cl. 740, 742 (2006) (same).

Count One is not moot.  The entirety of the government's 12(b)(1) motion relies on the faulty premise that the Army was not required to apply VASRD 4.129 at the time of SPC Cook's discharge.  *See* Def. Mot. at 19.  Contrary to the government's argument, the Army's retroactive decision *by an appellate tribunal* to place SPC Cook on the TDRL with a 50 percent rating for PTSD for the six-month period after his discharge and then permanently reduce the 50 percent rating to 10 percent does not resolve SPC Cook's claim under Count One because the Army has yet to provide SPC Cook with the rights guaranteed to service members under the October 2008 DoD Directive which requires strict compliance with VASRD 4.129.  These rights are the right to continuous retention of a minimum 50 percent rating for PTSD unless and until the veteran is provided with a post-discharge medical examination to assess the current level of disability and the right to all of the other procedural protections guaranteed by military regulations.

Count One asks the Court to put SPC Cook in the same position he would have been had the Army complied with the law at the time of SPC Cook's discharge.  *See Mass. Bar Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997) ("The general rule is that damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation") (citations omitted); s*ee also Christian v. United States*, 337 F.3d 1338, 1345 (Fed. Cir. 2003) (applying this general rule where the military branches violate the rights of a service member); *Dilley v. Alexander*, 603 F.2d 914 (D.C. Cir. 1979), *clarified by* 627 F.2d 407 (D. C. Cir. 1980) (same).

The October 14, 2008 DoD Memorandum compelling compliance with VASRD 4.129 demonstrates what relief the Court should order based on Count One.  That Memorandum demonstrates that compliance with VASRD 4.129 requires that those who are determined by a PEB to be unfit for continued service due to PTSD should be assigned at least a 50 percent disability rating for PTSD.  Under Chapter 61 of Title 10, U.S.C., if the Service Branch finds that a service member is unfit for continued service and a 50 percent disability rating is assigned for the condition that renders the service member unfit, the Service Branch must either permanently retire the service member or place the service member on the TDRL.  *See supra* at 7.  Therefore, to place SPC Cook in the same position that he would have been in had the Army complied with the law and assigned him a PTSD disability rating of 50 percent upon separation from active service, his military records must be corrected to show that on the date of release from active service, he was either (i) permanently retired or (ii) placed on the TDRL and provided the procedural safeguards provided by statute.  Had he been permanently retired, of course, there would have been no re-examination.

- 34 -

With respect to the TDRL, a service member initially placed on the TDRL enjoys certain procedural protections before a Service Branch may reduce the disability rating initially assigned upon placement on the TDRL. Specifically, Section 1214 provides that "[n]o member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it." 10 U.S.C. § 1214. To comply with Section 1214, the Service Branches have promulgated regulations providing the following full range of procedural rights and protections before a Service Branch may reduce the disability rating initially assigned upon placement on the TDRL including the following:

- the right to a free military medical examination to assess the current severity of the veteran's disability;
- the right to a formal hearing and to appear personally at the formal hearing;
- the right to the appointment of free military counsel for representation at the formal hearing;
- the right to testify, to compel the attendance of witnesses at the hearing, and to submit other evidence regarding the service member's condition;
- the right of access to all records and information received at the formal PEB hearing that may affect the findings of the PEB or appellate review authority;
- the right to a written rationale explaining the findings and recommendations of the formal PEB; and
- the right to retain a previously-awarded disability rating that resulted in placement on the TDRL until that rating is changed by a PEB that affords the service member these procedural safeguards.

*See* DoDI 1332.38, Enclosure 3, Part 1 at 3.3.5; Army Regulation 635-40 at 4-21, 7-19, 7-20.

The Army's argument—that an appellate body like a PDBR (or by implication a Board of Correction for Military Records, or "BCMR") can moot a lawsuit challenging a PEB's decision to separate a soldier without military disability retirement benefits by retroactively placing the soldier on the TDRL with a higher disability rating, and, at the same time, retroactively denying the soldier permanent disability retirement by reducing that higher rating, effective at a later point in time—would mean that the Army could wrongfully deny military disability retirement

- 35 -

benefits to soldiers at the point of medical separation and never have to suffer the consequences; the Army could avoid providing the soldier with (a) permanent disability retirement benefits, (b) a free post-discharge medical examination, and (c) the right to a hearing, free counsel, and other procedural safeguards guaranteed by 10 U.S.C. § 1214 and Army regulations.  All the Army would have to do is direct the wronged soldier to apply to a PDBR or BCMR, which does not provide applicants with a free post-discharge medical examination or the right to free military counsel, to a hearing, or to compel the attendance of witnesses.

Contrary to the Army's argument, 10 U.S.C. § 1214 and the case law require the Army to place the wronged soldier in the same position he would have been in had the Army performed its obligations.

Thus, this Court should order the Army to correct SPC Cook's records to reflect either that he was (a) permanently retired for disability with at least a 50 percent disability rating for PTSD retroactive to the date of his medical separation in 2007; or (b) placed on the TDRL with at least a 50 percent disability rating for PTSD retroactive to the date of his medical separation in 2007 and enjoin the Army from reducing this 50 percent rating unless and until the Army provides SPC Cook with the procedural safeguards required by 10 U.S.C. § 1214 and DoD and Army regulations.

*Sabo v. United States*, No. 08-899 C (Fed. Cl., filed Dec. 17, 2008), provides further proof that the PDBR's actions in 2014 do not moot Count One of the Complaint.  The *Sabo* class action was filed because the October 2008 DoD Memorandum directing the military services to comply with VASRD 4.129 had only prospective effect.  It did nothing to remedy the failure of the Army to comply with VASRD 4.129 in separating soldiers like SPC Cook with a less than 50

percent rating for PTSD prior to October 2008.  As a result, in December 2008, a class action

was filed in the Court of Federal Claims on behalf of veterans who, like SPC Cook, had been

separated between December 2002 and October 2008 with a less than 50 percent rating for PTSD

in violation of VASRD 4.129.

Initially, the military services argued in *Sabo*, much as the Army argues here, that only

the PDBR or a BCMR could provide a class member with compliance with VASRD 4.129.  In

2011, the *Sabo* plaintiffs filed a motion for summary judgment, arguing that each class member

who, like SPC Cook, was medically separated with a less than 50 percent rating for PTSD was

entitled to the same relief that SPC Cook seeks here on Count One.  *See* Motion for Summary

Judgment, *Sabo*, No. 08-899, Dkt. 90.

The turning point in the *Sabo* litigation occurred when the Court granted Plaintiffs'

Motion to Lift the Stay and ordered the government to respond to Plaintiffs' Motion for

Summary Judgment.  *See* Order, *Sabo*, No. 08-899, Dkt. 93.  Instead of arguing, as the Army

does here, that the case was moot due to the availability of the PDBRs and the BCMRs, the

government never even filed a response.  Instead, the government entered into a proposed class

action Stipulation and Order, later approved and Ordered by the Court, (*Sabo v. United States*,

102 Fed. Cl. 619 (Fed. Cl. 2011)), providing, among other things, the following relief:

- With respect to the large majority of the 2,176 class members whose case had not been
  reviewed by a PDBR or BCMR, *none of them had to pursue an application to the PDBR or
  BCMR in order to obtain the relief provided by the Stipulation and Order*;
- All of the at least 782 class members who had been medically separated and whose case had
  not been reviewed by a PDBR or BCMR received a Court-Ordered set of corrected military
  records reflecting permanent military disability retirement with a *lifetime, increased*

disability rating for PTSD (605 of whom received *lifetime* ratings of 50 percent or more) *without ever having to have their case reviewed by a PDBR or BCMR*;[2]

- About 673 who were initially placed on the TDRL and whose case had not been reviewed by a PDBR or BCMR automatically received by virtue of a Court Order corrected military records that increased to 50 percent the PTSD disability rating they had received upon release from active duty and that 50 percent rating would remain in effect until the military service provided the veterans with a post-discharge medical examination and the right to the panoply of procedural safeguards guaranteed by military regulations, *without ever having to have their case reviewed by a PDBR or BCMR*;[3] and

- About 247 class members who, like SPC Cook, had been medically separated and *did receive* a PDBR or BCMR decision were given the Court-ordered right to elect to *void* the relief provided by the PDBR or BCMR in their case *in favor of the higher PTSD disability rating that was granted to the veteran by the VA*.[4]

The relief voluntarily provided by the government to the *Sabo* class cannot be squared with the government's argument here that Count One of SPC Cook's complaint is rendered moot by the PDBR's decision.

Because the Army violated SPC Cook's service member rights and has not put him in the same position he would have been had the Army complied with the law at the time of his discharge, Count One remains a live controversy and is not moot.  Therefore, the government's 12(b)(1) motion to dismiss Count One as moot should be denied.

### F.    SPC Cook Did Not Waive His Right to Judicial Review of the Army's 2007 Medical Separation Agreement

The government takes the extreme and inconsistent position that, even though the Service Branches had a blanket policy to ignore VASRD 4.129 in contravention of their statutory

---

[2]    Joint Motion for Preliminary Approval of Class Action Settlement Agreement, *Sabo*, No. 08-899, Dkt. 116 at 4.  The opinion issued by the Court indicated that there were additional opt-ins after this motion was filed.  *See Sabo*, 102 Fed. Cl. at 624.

[3]    *Sabo*, No. 08-899, Dkt. 116 at 4.

[4]    *Id.*

mandate, SPC Cook was required to formally demand that the Army *actually follow the law*. As explained below, such a petition to a formal PEB would have been futile.

Indeed, the government's own arguments in its Opposition establish that futility—the government admits an institutional, across-the-board refusal to apply VASRD 4.129, and attempts to justify that refusal. The core of the government's waiver argument, and the backbone of many of the cases it relies on to justify its position, is a line of cases stemming from *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952). *L.A. Tucker Truck* stands for the proposition that a party may waive certain arguments by failing to exhaust available administrative remedies with respect to those arguments. *Id.* at 38; *see also id.* at 37 ("[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has the opportunity for correction in order to raise issues reviewable by the courts"); *United States v. Gant*, 63 Fed. Cl. 311, 318 (2004) (quoting same "orderly procedure" language); *accord Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008) (citing *L.A. Tucker Truck* and discussing futility exception).[5]

But Federal Circuit cases applying *L.A. Tucker Truck* recognize the well-established futility exception to the general rule that a party must exhaust available administrative remedies. *See, e.g.*, *Mittal*, 548 F.3d at 1384 (acknowledging futility exception but denying its application to facts of case); *Corus v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) (discussing but

---

[5] Indeed, nearly every case relied on by the government either cites *L.A. Tucker Truck* directly, or cited to *Gant* which is grounded in *L.A. Tucker Truck*. *See Gant*, 63 Fed. Cl. at 318 (quoting *L.A. Tucker Truck*, 344 U.S. at 37); *Jardon v. United States*, No. 10-738, 2013 U.S. Claims LEXIS 118, at *41, 44 (Fed. Cl. 2013) (citing *Gant*, 63 Fed. Cl. at 318); *Warner v. United States*, 103 Fed. Cl. 408, 413 (2012) (quoting *L.A. Tucker Truck*, 344 U.S. at 37); *Williams v. United States*, 100 Fed. Cl. 263, 274 (2011) (citing *Gant*, 63 Fed. Cl. at 318; *Stine v. United States*, 92 Fed. Cl. 776, 791–92 (2010) (citing *Gant*, 63 Fed. Cl. at 318).

declining to apply futility exception to facts of case); *Asociación Colombiana de Exportadores de Flores v. United States*, 916 F.2d 1571, 1575 (Fed. Cir. 1990) (applying futility exception where regulations precluded administrative review of issue and, consequently, adverse decision was certain); *Colo. Dep't of Human Servs. v. United States*, 74 Fed. Cl. 339, 346 (2006) (recognizing futility exception to administrative exhaustion requirements). To show futility, a party must demonstrate that it would have been required to go through obviously useless motions in order to preserve its rights. *See Mittal*, 548 F.3d at 1384.

Here it would have been futile for SPC Cook to proceed to a formal PEB (or any other administrative forum) and argue that VASRD 4.129 should be applied. The Army PEBs universally disregarded VASRD 4.129 in rating unfitting PTSD, notwithstanding the facts of SPC Cook's medical condition. Indeed, the government now argues (erroneously) that that categorical position was legally justified. Thus, any argument that VASRD 4.129 should apply at the administrative level would obviously have failed. *Cf. Mittal*, 548 F.3d at 1375 (rejecting futility exception where administrative forum's action showed receptiveness to arguments on the relevant issue). Unlike in *Corus*, in this case, an adverse decision was a certainty, rather than a mere likelihood. 502 F.3d at 1379. It would have been useless and a waste of administrative resources for SPC Cook to pursue an PEB and assert the VASRD 4.129 argument.

## II. SPC COOK IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD ON COUNT TWO  BECAUSE THE ARMY'S DECISION TO ADOPT THE MINORITY PDBR DETERMINATION IS ARBITRARY AND CAPRICIOUS, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND CONTRARY TO LAW

The rules that govern the PDBR provide that it must apply the VASRD in effect at the time the veteran was medically separated. *See* DoDI 6040.44, Enclosure 3 § 5e. SPC Cook

argued that the proper application of VASRD 4.129 was to correct his records to reflect that, on the day of his discharge he was either (a) permanently retired or (b) placed on the TDRL with a 50 percent rating for PTSD, with the TDRL status and 50 percent rating to remain in effect continuously unless and until the Army provides SPC Cook with a medical examination and a PEB proceeding with all of the procedural safeguards provided by Army regulations. *See* ARII-19 through ARII-32; *see also* DoD October 14, 2008 Policy Memorandum. Neither the PDBR nor the Secretarial review authority responded to this argument. Instead, the PDBR acted under the assumption that under VASRD 4.129 SPC Cook should be placed on the TDRL for a six-month period from the date of medical separation and then the PDBR should assess, as best it could from the evidence of record, what SPC's Cook rating for PTSD should have been if he had been provided a medical examination at the six-month point (an examination which never occurred), using the criteria set forth in VASRD 4.130. *See* Def. Mot. at 24–25 (stating the government's position that VASRD 4.130 contains the appropriate criteria for assessing the appropriate rating for PTSD for SPC Cook). Even ignoring SPC Cook's primary argument, however, and applying the PDBR's mistaken approach, the PDBR minority's 10 percent rating, and the Secretarial review authority's decision to reject the majority's 30 percent rating and adopt the minority opinion, is arbitrary and capricious, unsupported by substantial evidence, and contrary to law.

### A.   The Army Failed To Resolve Reasonable Doubt in SPC Cook's Favor or To Engage in De Novo Review, as Required by Law

The PDBR minority's opinion, adopted by the Secretarial review authority, suffers from a fundamental error. It did not apply a *de novo* standard of review, as numerous Judges of this Court have held it was required to do. *See Adams*, 117 Fed. Cl. at 650 (collecting cases).

- 41 -

Instead, the minority placed a thumb on the scale by giving significant weight to the PEB's assignment of a 10 percent rating in 2007—during the period in which the military unfairly assigned unduly low disability ratings as demonstrated at the 2007 Hearing, leading to passage of the Wounded Warrior Act that created the PDBR.

First, the minority opinion references the PEB's assessment of SPC Cook's duty performance:  "Review of the PEB's discussion of the applicant's PTSD indicates that he was working a full 40 hour week with acceptable duty performance."  ARII-11.  Second, the minority opinion references the PEB's decision to assign a 10 percent rating to SPC Cook's PTSD:  "The PEB adjudicated the PTSD as unfitting, rating the condition at 10% and having mild industrial impairment.  Given the documentation available, the minority voter believes that 10% was a fair and equitable rating at the time of separation."  *Id.*  Finally, the minority opinion references the PEB's decision in justifying its own decision to recommend a 10 percent rating at the end of the 6-month TDRL period:  "Therefore, the minority voter believes that the PEB's rating of 10% would be the fairest adjudication of the applicant's condition at the end of the 6-month TDRL period."  *Id.*  This reliance constitutes prejudicial error.  Regardless of any perceived deficiencies in the evidence of record, under the *de novo* standard of review, past adjudications are not entitled to any weight whatsoever.  The failure of the minority and Secretarial review authority to review SPC Cook's case *de novo* requires reversal of the Secretarial review authority's decision.

The minority opinion also is contrary to the law because, although it acknowledged that "[w]e do not know what [the initial VA] award would have been if the applicant had reported for his initial C&P exam," and recognized that there was at least reasonable doubt regarding SPC Cook's disability at the end of the six-month TDRL period, ARII-11; *see also id.* ("[T]here were

no evaluations at or near the 6 month time period that could be effectively used to rate the applicant."), the minority, faced with such uncertainty, did not resolve this doubt in favor of SPC Cook, as required by law. *See* VASRD 4.3; *cf. Brown v. Gardner*, 513 U.S. 115, 117–18 (1994) (providing "that interpretive doubt is to be resolved in the veteran's favor"); *cf. also* ARII-09 (PDBR Record of Proceedings, Majority Opinion, at 4 (citing VASRD 4.3 and concluding that SPC Cook should have been afforded 30 percent rating at end of six-month TDRL period)). Instead, the minority resolved any doubt *against* SPC Cook.

### B.      The Army to Failed Consider the Evidence in Light of the Legal Standard

The PDBR minority and Secretarial review authority's decision is arbitrary and capricious not only because it is contrary to the law but also because it repeatedly "failed to consider an important aspect of the problem" and "offered an explanation for its decision that runs counter to the evidence." *Adams*, 117 Fed. Cl. at 653 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43–44 (1983). We explain below that the numerous respects in which the minority and Secretarial review authority's opinion is arbitrary and capricious.

The government asserts that VASRD 4.130 contained the rating criteria that the PDBR was required to apply at the six-month point after SPC Cook was separated from active duty. Under VASRD 4.130, "Schedule of ratings – mental disorders," PTSD can receive a disability rating of 10, 30, 50, 70, or 100 percent. The criteria for 50, 30, and 10 percent ratings are set forth below:

> [50 percent rating:] Occupational and social impairment with reduced reliability
> and productivity due to such symptoms as: flattened affect; circumstantial,
> circumlocutory, or stereotyped speech; panic attacks more than once a week;
> difficulty in understanding complex commands; impairment of short- and long-

term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships.

[30 percent rating:] Occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events)

[10 percent rating:] Occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication.

VASRD 4.130.

Under VASRD 4.130, a 10 percent rating is an exceedingly low rating. It is reserved for "mild or transient symptoms" that adversely affect work efficiency and ability to perform occupational tasks "only during periods of significant stress." The minority opinion, and its adoption by the Secretarial review authority, is arbitrary and capricious because it does not consider whether SPC Cook's debilitating symptoms appeared "only during periods of significant stress." This is arbitrary and capricious because the opinion "entirely failed to consider an important aspect of the problem" as to the appropriate degree of disability. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43–44.

Next, the minority opinion and its adoption by the Secretarial review authority discounted the medical evidence contained in the addendum to the narrative summary ("NARSUM") written two months prior to the 2007 PEB because the addendum to the NARSUM "was difficult to follow with respect to definitively categorizing the applicant at either the 10% or 30% rating category." ARII-11. This explanation, however, "runs counter to the evidence," *Motor Vehicle*

- 44 -

*Mfrs. Ass'n*, 463 U.S. at 43–44, because nothing that is *relevant* in the NARSUM was difficult to follow.  The purpose of the NARSUM and the addendum to the NARSUM is to fully describe a patient's medical conditions and their effects on the patient's physical capabilities so that the PEB can properly rate the degree of disability.  Army Regulation 635-40, at 4–11.  Its role is not to expressly assign a rating.

The minority opinion also mischaracterized the evidence.  Relying heavily on a passing reference in the Commanding Officer's Statement of Captain Otis that SPC Cook was working a 40-hour workweek as of May 2007, the minority suggests that this was indicative of his ability to work.  ARII-11.  The minority's use of Captain Otis's statement, however, "runs counter to the evidence."  The full statement from Captain Otis says, "The severity of the conditions has placed great difficulties and stresses on the soldier, *severely limiting his ability to work*."  ARI-26 (emphasis added).  Similarly, the minority opinion cherry-picks Captain Otis's statement that "SPC Cook's duty performance has been exemplary."  ARII-11.  This opening statement of respect for SPC Cook is poor support to say the least for the minority decision to assign a 10 percent rating.  The minority's focus on the Commander's prefatory statement, devoid of its context, is incommensurate with its significance, out of line with its meaning, and "counter to the evidence."

Another error involves the fact that the record reveals that SPC Cook suffered from two symptoms—"depressed mood" and "anxiety"—that are listed in VASRD 4.130 as warranting a 30% rating.  The following evidence is relevant to SPC Cook's symptoms of "depressed mood" or "anxiety."

- After examining SPC Cook on April 3, 2007, Dr. Melissa Paliani wrote that "[i]t is clear that [SPC Cook] suffers from both anxiety and depression." ARI-15.  The following were

the symptoms of depression that SPC Cook reported to Dr. Paliani:  "feelings of depression, anhedonia, and loss of energy, decreased appetite and difficulty sleeping."  *Id.*  Furthermore, Dr. Paliani found that SPC Cook suffered from the following symptoms of PTSD:  disturbing memories, thoughts or images of stressful events, feeling upset when something reminds him of the stressful military experience, and hypervigilance.  *Id.*

- On a Department of Defense Form 2807-1, Report of Medical History, dated May 4, 2007, SPC Cook indicated that he was suffering from depression or excessive worry.  ARI-22.
- On May 18, 2007, SPC Cook's Commander, Captain James Otis drafted a memorandum describing the impacts that SPC Cook's disabilities had on his military duty performance.  Captain Otis noted that SPC Cook was diagnosed as having PTSD, chronic depression, and anxiety and described that the "severity of [SPC Cook's] conditions has placed great difficulties and stresses on the soldier, severely limiting his ability to work."  ARI-26.
- A VA medical record, dated February 2, 2011, describes a November 2008 phone call received by the VA from SPC Cook.  ARII-226.  This record describes a phone call received by Wally Lewis, RN, from SPC Cook, in which the veteran's chief complaints included mood swings and depressed mood.  *Id.*
- During a VA examination performed on May 21, 2009, Dr. John Krogh indicated that SPC Cook "feels sad, angry, and moody each day and has difficulty caring about others or forming relationships."  ARII-73.  Dr. Krogh also noted that SPC Cook's "experience with symptoms appear to have made it difficult for him to socialize, interact with others, concentrate, sleep, manage his emotions, and connect with others."  ARII-76.  "He used to like many activities," Dr. Krogh reported.  "[B]ut now has a hard time seeing the point of these activities."  *Id.*
- The VA again confirmed SPC Cook's severe PTSD in its August 2009 rating decision based on the May 21, 2009 medical evaluation, finding that SPC Cook's PTSD with insomnia and depression had become so severe that it warranted an increase from 50 percent to 70 percent disabling.  ARII-89.  The VA noted that SPC Cook reported his social relationships as "spiraling downhill" since his military discharge.  ARII-90.  The report noted that SPC Cook felt "sad, angry, and moody each day and [had] difficulty caring about others or forming relationships" and that he felt "emotionally and psychologically distanced from others."  ARII-90–91.  Further, SPC Cook reported "extreme mood swings" that were "very intense."  ARII-90.
- The VA once more confirmed SPC Cook's severe PTSD on August 10, 2011, when it maintained a 70 percent rating based on "complaints of violent behavior including domestic violence, anger control issues, depressed mood, irritability, startle reaction, and intrusive thoughts."  ARII-335.

The minority opinion adopted by the Secretarial review authority never referred to this evidence or how this important evidence factored into the decision on the appropriate disability rating.

This is arbitrary and capricious because the opinion "entirely failed to consider an important

aspect of the problem" as to the appropriate degree of disability.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43–44.

Next, the record reveals that SPC Cook suffered from another symptom—"chronic sleep impairment"—that is listed in VASRD 4.130 as warranting a 30% rating.  The following evidence is relevant to SPC Cook's symptoms of "chronic sleep impairment."

- After examining SPC Cook on April 3, 2007, Dr. Melissa Paliani noted that SPC Cook was having difficulty sleeping.  ARI-15.
- On a Department of Defense Form 2807-1, Report of Medical History, dated May 4, 2007, SPC Cook indicated that he was having frequent trouble sleeping.  ARI-22.
- The Medical Evaluation Board Narrative Summary, written by Dr. John Wilhite on May 23, 2007, states that SPC Cook was "sleeping on average '4 to 5 hours per night and a maximum of 5 to 6 hours per night.' He has a recurring dream about experiences in Iraq." ARI-11.
- During a VA examination performed on May 21, 2009, Dr. John Krogh described SPC Cook's sleep impairment as follows: "Veteran is unable to sleep for more than a couple of hourse [sic] without waking due to hypervigilance of sounds, distressing dreams related to traumatic experiences.  He also has difficulty getting to sleep for similar reasons."  ARII-70.  Furthermore, Dr. Krogh stated that SPC Cook had persistent re-experiencing of traumatic events by recurrent distressing dreams of the event.  ARII-72.
- In a declaration that was submitted to the PDBR, SPC Cook stated "After my return from Iraq and subsequent discharge from the Army, . . . I could not sleep for more than a couple hours at a time, waking frequently and feeling anxious.  I often had nightmares when asleep and was anxious and angry when awake."  ARII-42.

The minority opinion adopted by the Secretarial review authority never referred to this evidence or how this important evidence factored into the decision on the appropriate disability rating.  This is arbitrary and capricious because the opinion "entirely failed to consider an important aspect of the problem" as to the appropriate degree of disability.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43–44.

Yet another error involves the fact that the record reveals that SPC suffered from a symptom—"suicidal ideation"—that is listed in VASRD 4.130 as warranting a 70 percent rating. The following evidence is relevant to SPC Cook's symptom of "suicidal ideation."

- In a declaration that was submitted to the PDBR, SPC Cook stated: "After my return from Iraq and subsequent discharge from the Army, . . . I often had nightmares when asleep and was anxious and angry when awake.  Suicide had crossed my mind during this time."  ARII-42
- A VA medical record describes a phone call received by the VA from SPC Cook in November 2008.  ARII-226.  This record describes the phone call received from SPC Cook as follows: "MHC 11/2008:  Veteran phoned Wally Lewis, RN yesterday and was having suicidal thoughts . . . ."  *Id.*
- During a VA examination of SPC Cook performed on May 21, 2009, Dr. John Krogh indicated a presence of suicidal thoughts and summarized his observations as follows: "He described occasional thoughts of self-harm and has considered many options, but denied a specific plan at this time. . . .  He did explain that he can be overwhelmed by anger or intense emotions and experience suicidal ideation.  Veteran was provided the suicide helpline number and he agreed to use this if he needed.  He also reported calling the VA for the suicide helpline number in the past."  ARII-71 through ARII-72.
- In February 2011, SPC Cook reported three suicide attempts in the past, with the most recent attempt in October 2009.  ARII-225.

The minority opinion adopted by the Secretarial review authority never referred to this evidence or how this important evidence factored into the decision on the appropriate disability rating.  Again, this is arbitrary and capricious because the opinion "entirely failed to consider an important aspect of the problem" as to the appropriate degree of disability.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43–44.

In addition to the evidence outlined above as to the specific symptoms SPC Cook experienced, further evidence demonstrates that SPC Cook's PTSD symptoms were neither mild nor transient, but rather pervaded his life since discharge:

- Following his discharge, SPC Cook and his father began to fight more often and, at times, SPC Cook contemplated physical violence against his father.  ARII-76 (Medical Record, dated Dec. 4, 2008).  In January 2008, less than a year after his discharge, SPC Cook severed ties with his father.  ARII-43.
- SPC Cook's medical records show he required for face-to-face appointments with the PTSD Clinical Team at the VA Medical Center in Reno from February to October 2008.  ARII-67.
- Based on SPC Cook's symptoms, VA physicians summarized SPC Cook's diagnosis of "moderate to severe" PTSD that "made it difficult for him to socialize, interact with

others, concentrate, sleep, manage his emotions, and connect with others."  ARII-75 through ARII-76; *see also* ARII-44 (describing moderate to severe PTSD).

• In a declaration that was submitted to the PDBR, SPC Cook stated that "Following my discharge from the Army and even during and after the second VA Rating Decision in August 2009, I noticed that my PTSD and depression got worse and my relationships with family members, co-workers and friends continued to deteriorate."  ARII-41.

Ultimately, the evidence shows that SPC Cook should have been awarded a permanent disability rating of 30 percent or higher, as recommended by the majority of the PDBR.  The minority and Secretarial review authority's decision to the contrary repeatedly fails to consider important aspects of SPC Cook's disability rating, and it runs counter to the evidence.

## **CONCLUSION**

For the reasons set forth above, SPC Cook respectfully requests the Court to grant SPC Cook's Cross-Motion for Judgment upon the Administrative Record as to Count One, or, in the Alternative, as to Count Two.  For these same reasons, the SPC Cook requests the Court to deny the government's Motion to Dismiss Count One of the Amended Complaint, Or, in the Alternative, Motion for Judgment upon the Administrative Record (Dkt. 17).

Dated this 21st day of October, 2014.

Respectfully submitted,

  /s Lee Berger            
Lee F. Berger (Counsel of Record)
Paul Hastings LLP
875 15th Street NW
Washington, DC 20005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of October, 2014 a copy of the foregoing document was electronically filed with the Clerk of the Court for the United States Court of Federal Claims using the CM/ECF system which will issue an electronic notification of filing to all parties entitled to receive notice.

<u>   /s Lee Berger                    </u>
Lee F. Berger (Counsel of Record)
Paul Hastings LLP
875 15th Street NW
Washington, DC 20005