# In the United States Court of Federal Claims

No. 13-523C
(Filed: October 21, 2015)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| RONALD C. COOK, | Motion to Dismiss; Mootness; Failure to State a Claim; Motion for Judgment on the Administrative Record; Waiver; Application of Sections 4.129 and 4.130 of the Veterans Affairs Schedule for Rating Disabilities to Soldiers Discharged With PTSD Prior to the Enactment of the Wounded Warrior Act in 2008; 10 U.S.C. Chapter 61; Authority of the Physical Disability Board of Review Under 10 U.S.C. § 1554a; Army Acted Contrary to Law |
| Plaintiff, | |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Lee F. Berger, Washington, DC, for plaintiff.

Douglas G. Edelschick, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff Ronald C. Cook was medically separated from the United States Army ("Army") for posttraumatic stress disorder ("PTSD") resulting from his service in Iraq during Operation Iraqi Freedom. Because the Army determined that plaintiff suffered from mild PTSD, it assigned him a 10% disability rating, which is below the threshold to qualify for disability retirement. Plaintiff now seeks the correction of his military records to reflect a higher disability rating and entitlement to disability retirement. Defendant moves to dismiss one of plaintiff's claims, and the parties cross-move for judgment on the administrative record on both of plaintiff's claims. Defendant further moves to strike a document attached to one of plaintiff's briefs. For the reasons set forth below, the court denies defendant's motion to dismiss, grants in part and denies in part defendant's motion for judgment on the administrative record, grants in part and denies in part plaintiff's cross-motion for judgment on the administrative record, and denies defendant's motion to strike as moot. This case is remanded to the Army for the correction of plaintiff's military records.

# I. BACKGROUND

## A. The Army's Disability Evaluation System

When a physical disability renders a member of the military unfit to perform his or her duties, the member may be separated or retired from service. 10 U.S.C. ch. 61 (2006). A member's fitness for duty and eligibility for separation or retirement is governed by regulations promulgated by the Secretary of the military department to which the member belongs.[1] Id. § 1216. Relevant here is Army Regulation 635-40, "Physical Evaluation for Retention, Retirement, or Separation" (Feb. 8, 2006) ("Army Regulation 635-40").

The Army's disability evaluation process begins with a soldier's referral to a medical treatment facility for evaluation. Army Regulation 635-40, ¶¶ 4-6 to 4-8. If the commander of the medical treatment facility determines that the soldier may not be "medically qualified to perform duty," the commander will refer the soldier to a Medical Evaluation Board ("MEB"). Id. ¶ 4-9. The MEB documents the soldier's medical condition and duty limitations, and then evaluates the soldier's medical condition against specified retention criteria. Id. ¶ 4-10. If it determines that the soldier does not meet the retention standards, the MEB refers the soldier to a Physical Evaluation Board ("PEB"). Id. ¶¶ 4-10, 4-13(a).

PEBs are fact-finding boards charged with "[i]nvestigating the nature, cause, degree of severity, and probable permanency" of a soldier's disability; "[e]valuating the physical condition of the Soldier against the physical requirements of the Soldier's particular office, grade, rank, or rating"; "[p]roviding a full and fair hearing for the Soldier as required by" 10 U.S.C. § 1214; and "[m]aking findings and recommendations required by law to establish the eligibility of a Soldier to be separated or retired because of physical disability." Id. ¶ 4-17(a). In making the required findings and recommendations, the PEB must first determine whether the soldier is "physically fit or unfit to perform" his or her duties. Id. ¶ 4-19(a)(1), (d)(1). If the PEB determines that the soldier is unfit for duty, it must also determine, among other things, "[w]hether the disability is of a permanent nature," id. ¶ 4-19(a)(2), (h), and "the rating for each compensable disability," id. ¶ 4-19(f)(5), (i); accord id. ¶ B-3(a). The PEB assigns disability ratings, which reflect the severity of the disabilities, using the United States Department of Veterans Affairs Schedule for Rating Disabilities ("VASRD"). Id. ¶¶ 4-19(f)(5), (i), B-3(a).

---

[1] Under 10 U.S.C. § 1216, the "Secretary concerned" is responsible for promulgating the regulations for his or her military department. See 10 U.S.C. § 101(a)(9) (defining "Secretary concerned" as either the Secretary of the Army, the Secretary of the United States Navy, the Secretary of the United States Air Force, or the Secretary of the United States Department of Homeland Security). However, the United States Department of Defense ("Department of Defense") has also promulgated relevant regulations. Those regulations are discussed in later sections of this Opinion and Order.

A case referred by an MEB is considered first by an informal PEB.  Id. ¶ 4-20(a). Informal PEBs record their findings and recommendations on a DA Form 199, "Physical Evaluation Board (PEB) Proceedings," which is then forwarded to, among others, the soldier and the soldier's PEB liaison officer.  Id. ¶ 4-20(b).  Upon receipt of the DA Form 199, the solider may elect to (1) concur with the findings and recommendations and waive a formal hearing; (2) disagree with the findings and recommendations, submit a rebuttal statement, and waive a formal hearing; (3) demand a formal hearing; and/or (4) have representation by counsel if a hearing is demanded.  Id. ¶ 4-20(c)(1).  The soldier's PEB liaison officer must counsel the soldier regarding his or her options, the processing procedures, and the benefits that would flow from the informal PEB's findings and recommendations.  Id. ¶ 4-20(d)(1).  After the soldier makes an election on the DA Form 199, the PEB liaison officer must sign the form and then forward it to the PEB.  Id. ¶ 4-20(d)(2).  If, as happened in this case, the soldier concurs with the informal PEB's findings and recommendations and waives a formal hearing, "the proceedings will be approved for the [Secretary of the Army] and forwarded to [the Army's Human Resources Command] for final disposition."  Id. ¶ 4-20(e)(1).  Final dispositions include permanent retirement, placement on the temporary disability retirement list ("TDRL"), and separation.  Id. ¶ 4-24(b) (citing 10 U.S.C. §§ 1201-1206).  Of particular relevance in this case, a soldier with a permanent and stable disability and at least a 30% disability rating may be retired with retired pay, 10 U.S.C. § 1201, a soldier who has been assigned at least a 30% disability rating but whose disability is not permanent and stable may be placed on the TDRL with retired pay, id. § 1202, and a soldier with a permanent and stable disability and a disability rating of less than 30% may be separated from service with severance pay, id. § 1203.

## B. Plaintiff's Military Service

Plaintiff enlisted in the Army on May 1, 2000.  Admin. R. Vol. I 194.  He served two tours of duty overseas during Operation Iraqi Freedom.  Id.  During his first deployment–from April 2003 to February 2004–plaintiff served at Camp Victory in Kuwait and Al Asad Airbase in Iraq.  Id. at 88.  Upon his return, plaintiff underwent a health assessment in which he reported that during his deployment, he saw an enemy combatant "wounded, killed or dead"; did not engage in direct combat where he discharged his weapon; felt that he was "in great danger of being killed"; and had seen a "destroyed military vehicle."  Id. at 89-90.  Nevertheless, he indicated that he did not have any mental health concerns.  Id.  Indeed, he represented that he was not "interested in receiving help for a stress, emotional, alcohol, or family problem" and that he had not sought and did not intend to seek "counseling or care for [his] mental health."  Id. at 90; accord id. at 141 (indicating that plaintiff had not sought mental health counseling or care during 2004), 170 (same).

During his second deployment–from February 2005 to February 2006–plaintiff served in Baghdad, Iraq.  Id. at 160.  During his February 16, 2006 postdeployment health assessment, plaintiff indicated that he did not see anyone wounded, killed, or dead; did not discharge his weapon in direct combat; and did not feel in danger of being killed.  Id.  He did, however, see a

military vehicle that had been destroyed.  Id.  Despite reporting fewer exposures to potentially traumatic events, plaintiff reported some mental health issues.  Id.  Specifically, he reported having an experience that "was so frightening, horrible, or upsetting" that, in the past month, he had nightmares or unwanted thoughts about the experience; "[t]ried hard not to think about" the experience or "went out of [his] way to avoid situations that remind[ed]" him of the experience; and "[f]elt numb or detached from others, activities, or [his] surroundings."  Id.  Nevertheless, he indicated that he was not "interested in receiving help for a stress, emotional, alcohol, or family problem" and that he had not sought and did not intend to seek "counseling or care for [his] mental health."  Id.

Eventually, in June 2006, plaintiff underwent a comprehensive psychiatric evaluation.  Id. at 15, 134.  Over the following eight months, plaintiff attended a number of individual psychiatric therapy sessions and underwent a second comprehensive psychiatric evaluation.  Id. During these evaluations and therapy sessions, plaintiff was diagnosed with the following "chronic illnesses":  obsessive compulsive disorder ("OCD"), chronic PTSD, depression, insomnia related to a mental disorder, and an anxiety disorder.  Id.

Plaintiff was ultimately referred to an MEB.  In considering whether plaintiff met the relevant retention standards, the MEB considered, among other documents, the results of a mental health examination, the results of a physical examination, and letters from three of plaintiff's commanding officers.  Id. at 8, 15-24, 26-28.

With respect to plaintiff's mental health, plaintiff's psychologist provided a report to the MEB that described the development of plaintiff's mental health issues:

> In the past, [plaintiff ("SM" or "PT")] has been diagnosed with PTSD, Anxiety Disorder [Not Otherwise Specified], OCD and Major Depressive Disorder.  It is clear that SM suffers from both anxiety and depression. . . . SM reported the following symptoms of PTSD:  A-on 23 JUN 05 SM was told that SGT Phelps got blown up and he lost one arm, both legs and he suffered greatly; on 25 JUL 05 his friend PFC Swany was blown up and killed by the shrapnel from the explosion and on 5 JUL 05 SGT Bright and PFC Cambridge [were] killed by an [improvised explosive device] and PT saw their bodies.  B-repeated disturbing memories, thoughts or images of stressful events; nightmares; feeling upset when something reminds him of the stressful military experience and having physical reactions when something reminds him of the stressful military experience; C-avoidance of thoughts, conversations activities or situations that remind him of the stressful military event, anhedonia and feeling distant from other people; D-difficulty sleeping, irritability, [hypervigilance] and startle response.  SM reported the following symptoms of depression:  feelings of depression, anhedonia, and loss of energy, decreased appetite and difficulty sleeping.

Id. at 15.  She also found that plaintiff "was not an imminent danger to himself or others," was "competent for pay purposes," and had "the mental capacity to understand and participate in administrative proceedings."  Id. at 16.  Finally, she provided the following relevant diagnoses:

> 309.81 Posttraumatic Stress Disorder
> [Existed prior to service] - No
> Impairment for military duty - marked
> Impairment for social and industrial adaptability - mild
>
> 296.32 Major Depressive Episode Recurrent
> [Existed prior to service] - No
> Impairment for military duty - marked
> Impairment for social and industrial adaptability - mild

Id.

Plaintiff underwent the MEB physical examination on May 10, 2007.  Id. at 80-82.  In advance of this examination, plaintiff completed a medical history report on which he indicated that he had or has "[n]ervous trouble," "[f]requent trouble sleeping," and "[d]epression or excessive worry."  Id. at 84.  He also indicated that he had received counseling and had "[b]een evaluated or treated for a mental condition."  Id.  He denied having "[h]abitual stammering or stuttering," "[l]oss of memory or amnesia, or other neurological symptoms," "[a]ttempted suicide," or "[u]sed illegal drugs or abused prescription drugs."  Id.  During the examination, the physician assistant who evaluated plaintiff noted the following diagnoses:  PTSD, OCD, and major depression.  Id. at 82.  He further noted that plaintiff was "not qualified for service."  Id.

The final information considered by the MEB was letters from three of plaintiff's commanding officers.  One letter was from retired Staff Sergeant Steven D. Gain, who commanded plaintiff during both of his deployments to Iraq.  Id. at 28.  He wrote:

> SPC Cook was exposed to small arms and indirect fire during both tours to Iraq.  Spc Cook was exposed to wounded and deceased enemy and friendly during [Operation Iraqi Freedom] 1.  He was sent on raids with his unit and special forces troops.  He was not [exposed] to any downed aircraft that I know of.  SPC Cook did take part in raids and clearing houses and was [exposed] to wounded bodies.  He didn't injure or kill anyone that [I] know of.  SPC Cook did render first response care to wounded friendly.  After deployment SPC Cook has had trouble [controlling] his anger.

Id.  A second letter was prepared by First Lieutenant Lyndsey R. Nott.  Id. at 27.  She noted:

SPC Cook requests and receives parts, manages registered documents, turn in of recoverable items [sic], and also manages the document reconciliation register. SPC Cook works approximately 30 hours per week.  SPC Cook performs his duties to standard.  SPC Cook best performs his duties when he works alone. When SPC Cook works with others, he easily becomes distracted.  SPC Cook maintains a fairly strong working relationship with his peers.  While maintaining a strong working relationship with his peers, his superiors recognize that SPC Cook is prone to mood swings.

Id.  The third letter was submitted by Captain James W. Otis.  Id. at 26.  He wrote:

l.  SPC Cook'[s] Duty performance has been exemplary.  His work ethic and adherence to standards are in compliance with Army regulations.  He has been known as a technically proficient soldier.

2.  SPC Cook was diagnosed as having Post Traumatic Stress Disorder (PTSD), Chronic Depression, and anxiety.  SPC Cook'[s] visits to Evans Army Hospital range from one to two times a week for follow up treatments and therapy.  SPC Cook'[s] Doctors have been unable to develop acceptable forms of treatment.  His doctor[s] have recommended that he be sent to the medical board.

3.  The duty restrictions placed on SPC Cook, due to his condition, limit him in the types of duties in the Company and in his [primary Military Occupational Specialty ("MOS")].  It also limits his ability to lead and interact with others.  He currently spends two hours per week attending appointments.  He currently works a 40 hour work week.  It does not appear that his condition is in any way faked or exaggerated.  SPC Cook participates in therapy and it was deemed that little to no progress is being made.  The severity of the conditions has placed great difficulties and stresses on the soldier, severely limiting his ability to work.

Id.

The MEB issued its report on May 25, 2007.  Id. at 9.  In its narrative summary, the MEB described plaintiff's then-current status in the following manner:

The Soldier is not taking any psychiatric medications currently.  . . .  He is still attending regular psychotherapy visits.  Overall he does not feel that he has made any significant improvement.  He is sleeping on average "4 to 5 hours per night and a maximum of 5 to 6 hours per night."  He has a recurring dream about experiences in Iraq.  He is easily startled.  He has not required any psychiatric hospitalizations.  He denies any current suicidal or homicidal thoughts, plans or ideations.  He denies having any previous history of mental health problems.  In regards to what he feels is the most significant stressor during his tours in Iraq, he

stated "It was a 5-week period in 2005 where I lost seven of my friends."  He did view a few of the friends['] bodies and recalls vividly "SGT Bright, who was killed when a 500 bomb went off and his head was like putty."

Id. at 12.  The MEB then described plaintiff's "functional status and prognosis":

> This Soldier reports that he is still working in his MOS and he reports that his duties consist of inventory and ordering parts for the motor pool and working on the administrative side of vehicles.  When asked how his medical condition affects his ability to perform the duties of his MOS, he stated that "Sometimes I have recurring thoughts of my experiences in Iraq and when this occurs it will interfere with my concentration at work.  Sometimes things at work just remind me of Iraq."  Other military training and duties affected:  He cannot carry and fire an individual assigned weapon, perform 3 to 5 second rushes under direct or indirect fire, or be deployed.
>
> . . . .
>
> When the Soldier was asked if he wanted to continue on active duty, he stated "No."

Id. at 13.  And, the MEB summarized Captain Otis's statement as follows:

> . . . CPT Otis confirms the Soldier can no longer do the duties of his [primary MOS].
>
> The prognosis can best be estimated as stable to possible improvement if he were to be separated from the service and out of the military environment where he currently notes reminders that trigger thoughts of past experiences in Iraq.
>
> There have been no real compliance issues.  He has attended his appointments and the issue with medications is not so much compliance, as his desire not to take medications in general.

Id.

Ultimately, the MEB concluded that plaintiff failed to meet retention standards due to his PTSD and recurrent major depressive episodes, both of which originated in 2006.  Id. at 9, 13, 16.  It therefore referred plaintiff to a PEB.  Id. at 9, 14, 16.  Plaintiff indicated his agreement with the MEB's findings and recommendations on May 31, 2007.  Id. at 10.

An informal PEB convened on June 12, 2007, to consider plaintiff's case.  Id. at 1-3.  Its report–set forth on a DA Form 199–contained the following description of plaintiff's disability:

> Posttraumatic Stress Disorder (PTSD), onset following 2nd combat tour in Iraq, Feb 05 - Feb 06 . . . .  Symptoms include nightmares, anxiety, depression and flashbacks.  Symptoms of major depressive disorder are interrelated and included in this rating.  Competent for pay and records.  Treated with medication and counseling.  Profile restrictions against weapons prevent further military service.  Soldier works 40 hours per week with acceptable duty performance.  Rated as mild industrial impairment.

Id. at 1; see also id. (indicating that the relevant United States Department of Veterans Affairs ("VA") code for PTSD was 9411).  Based on this disability, the informal PEB deemed plaintiff "medically unfit" for duty.  Id.  The informal PEB further indicated that plaintiff's disability was not the result of "[i]ntentional misconduct, willful neglect or unauthorized absence" by plaintiff; was incurred or aggravated while plaintiff was entitled to basic pay; was incurred in the line of duty; and was the "[p]roximate result" of plaintiff performing his duty.  Id.; see also id. at 2 (noting that plaintiff's disability resulted from a combat-related injury and was incurred "in the line of duty as a direct result of armed conflict or caused by an instrumentality of war" and "during a period of war").  It assigned plaintiff a 10% disability rating for his PTSD and explained that such a rating, combined with plaintiff's less than twenty years of active duty service, would result in plaintiff's separation from the Army with severance pay.  Id. at 1-2.  The informal PEB did not cite the VASRD in its report.  See id.

On June 13, 2007, plaintiff reviewed the DA Form 199 with his PEB liaison officer, Michelle H. Harris.  Id. at 6-7.  As required by Army regulation, plaintiff and Ms. Harris completed DA Form 5893-R, "Acknowledgment of Notification of Formal Physical Evaluation Board Hearing."  Section II of the form contained the following instructions:  "The Physical Evaluation Board Liaison Officer is responsible for counseling soldiers throughout all phases of disability evaluation.  The [PEB liaison officer] will use this form[, which] will be forwarded to the PEB with the soldier's final election for inclusion in the case file.  [The PEB liaison officer] will mark each item completed."  Id. at 6.  Section III of the form contained five subsections that each contained a checklist of tasks that were to be performed by the PEB liaison officer; most of the tasks involved providing plaintiff with information regarding the disability evaluation process, his rights under that process, the consequences of exercising those rights, his various options, and the consequences of electing a particular option.  Id. at 6-7.  Ms. Harris did not mark each item completed on the form.  Id.  Rather, plaintiff signed his name (or, in one instance, initialed) across the check mark boxes in each subsection.  Id.  Plaintiff then signed his name at the end of the form to signify that he "was counseled on the above marked items as they pertained to my disability evaluation," and Ms. Harris signed her name to signify that she "counseled [plaintiff] on those items listed in the above checklist as they pertained to this case." Id. at 7.

After Ms. Harris had counseled plaintiff, plaintiff elected–the same day–to accept the informal PEB's findings and recommendations and waive a formal hearing.  Id. at 5.  He signified his election by initialing the appropriate option on the DA Form 199.  Id.  He then signed the form, representing that he had "been advised of the findings and recommendations of the physical evaluation board, and [had] received a full explanation of the results of the findings and recommendations and legal rights pertaining thereto . . . ."  Id.  Ms. Harris also signed the form, representing that she had "informed [plaintiff] of the findings and recommendations of the Physical Evaluation Board and explained to him[] the result of the findings and recommendations and his[] legal rights pertaining thereto."  Id.

In accordance with the informal PEB's recommendation, plaintiff was honorably discharged from the Army on July 30, 2007, with a 10% disability rating.  Id. at 194, 197.  Upon his separation he was entitled to severance pay.  Id.

## C. Plaintiff's Claims for Veterans Disability Benefits and Continuing Mental Health Issues

On July 2, 2007, plaintiff submitted a claim to the VA for disability benefits.  Admin. R. Vol. II ("ARII") 362.  In evaluating plaintiff's claim, the VA considered, among other documents, plaintiff's military service treatment records, the results of an October 15, 2007 VA medical examination, and a notification that plaintiff had not reported for a mental disorders/ PTSD examination.  Id. at 363-64; cf. id. at 599-600 (indicating that plaintiff reported, during the October 15, 2007 medical examination, a history of the following psychiatric symptoms: "interpersonal relationship difficulties," "depression," "loss of control/violence potential," "anxiety," and "sleep impairment").  In its November 26, 2007 rating decision, the VA determined that plaintiff had several service-connected disabilities:  PTSD with insomnia and depression, tinnitus, a sebaceous cyst on his neck, and a left shoulder labral tear.  Id. at 363, 371.  It assigned disability ratings of 50% for the PTSD (VA code 9411) and 10% for each of the other impairments, with a combined disability rating of 60%.  Id.  With respect to its PTSD decision, the VA explained:

> Your service treatment records show a diagnosis of PTSD with insomnia and depression due to your experiences in Iraq including the loss of seven friends. Your Medical Evaluation Board (MEB) shows that you were discharged from service due to PTSD and received severance disability pay for this condition.

> Our letter to you requested you tell us about any evidence or information that would show continuity of symptoms or treatment since discharge from active duty for the claimed condition.  To date, no such evidence has been received.

> You failed to report for a VA examination.  Evidence expected from this examination which might have been material to the outcome of your claim could not be considered.

According to [VASRD §] 4.129:  When a mental disorder that develops in service as a result of a highly stressful event is severe enough to bring about the veteran's release from active military service, the rating agency shall assign an evaluation of not less than 50 percent and schedule an examination within the six month period following the veteran's discharge to determine whether a change in evaluation is warranted.  Service connection for PTSD with insomnia and depression (also claimed as neurosis, anxiety disorder) has been established as directly related to military service.  An evaluation of 50 percent is assigned from July 31, 2007 based on [VASRD §] 4.129.

. . . .

Since there is a likelihood of improvement, the assigned evaluation is not considered permanent and is subject to a future review examination.

Id. at 364-65.

Between February and October 2008, plaintiff had four outpatient "face-to-face" appointments at the VA Medical Center in Reno, Nevada, for PTSD treatment.  Id. at 583; accord id. at 226 ("Veteran had [PTSD Clinical Team] intake 3/24/2008 with Dr. Boardman."), 282 ("Vet started w/PTSD Clinical Team 10/08. . . . Vet did attend 2 individual therapy sessions.").

The VA issued a second rating decision for plaintiff on January 8, 2009, proposing to decrease plaintiff's disability rating for his PTSD from 50% to 0% due to plaintiff's failure to report for scheduled VA examinations.  Id. at 358-59.  The VA explained:

The evaluation of PTSD with insomnia and depression (also claimed as neurosis, anxiety disorder) is proposed to be decreased to 0 percent disabling because you failed to report for a scheduled VA reexamination without good cause (38 CFR 3.65 (c)(2)).

You failed to report for two scheduled medical examinations to evaluate the current level of your service connected PTSD.  We sent letters dated August 14, 2008; October 22, 2008; and November 4, 2008.  A VA employee informed you via telephone conversation on November 4, 2008 that you were going to be scheduled for a VA examination.  The evidence does not provide documentation of a just cause for missing your examinations.

A noncompensable evaluation is assigned whenever there are symptoms that are not severe enough either to interfere with occupational and social functioning or to require continuous medication.  A higher evaluation of 10 percent is not warranted unless there are mild or transient symptoms which

-10-

decrease work efficiency and ability to perform occupational tasks only during periods of significant stress; or symptoms controlled by continuous medication.

Id. at 359; see also id. (noting that the VA's August 14, 2008 letter to plaintiff was returned due to an incorrect address).  The VA sent a letter to plaintiff describing its proposed action on January 14, 2009.  Id. at 353.  That letter was returned due to an incorrect address for plaintiff. Id.  The VA sent a second letter to plaintiff on March 10, 2009, and contacted plaintiff on April 27, 2009.  Id.

Plaintiff eventually underwent a VA PTSD review examination on May 21, 2009.  Id. at 353.  The examiner summarized plaintiff's PTSD symptoms as follows:

PERSISTENT RE-EXPERIENCING THE TRAUMATIC EVENT BY:

> Recurrent and intrusive distressing recollections of the event, including images, thoughts, or perceptions, Recurrent distressing dreams of the event, Acting or feeling as if the traumatic event were recurring, Intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event, Physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event

PERSISTENT AVOIDANCE OF STIMULI ASSOCIATED WITH THE TRAUMA AND NUMBING OF GENERAL RESPONSIVENESS:

> Efforts to avoid thoughts, feelings, or conversations associated with the trauma, Efforts to avoid activities, places, or people that arouse recollections of the trauma, Markedly diminished interest or participation in significant activities, Feeling of detachment or estrangement from others, Restricted range of affect (e.g., unable to have loving feelings), Sense of a foreshortened future (e.g., does not expect to have a career, marriage, children, or normal life span)

PERSISTENT SYMPTOMS OF INCREASED AROUSAL:

> Difficulty falling or staying asleep, Irritability or outbursts of anger, Difficulty concentrating, Hypervigilance, Exaggerated startle response

DESCRIPTION OF THE ONSET OF SYMPTOMS:  Chronic

FREQUENCY, SEVERITY AND DURATION OF PTSD SYMPTOMS FOUND:

"It has become my life.  I don't know what it would be like without this."
Veteran described reexperiencing phenomena, avoidance, and hyperarousal daily,
with high intensity, and variable duration.  He explained that he is extremely
bothered by his symptoms of PTSD.

LENGTH OF REMISSIONS AND CAPACITY FOR ADJUSTMENT DURING
REMISSION:

> Veteran denied any remissions.  He indicated that these symptoms started
> while he was stationed in Iraq and have continued since his discharge.  He
> explained that the symptoms have become worse since discharge that he
> feels like he is spiraling downhill.

IDENTIFIED BEHAVIORAL, COGNITIVE, SOCIAL, AFFECTIVE, OR
SOMATIC CHANGE THE VETERAN ATTRIBUTES TO STRESS
EXPOSURE:

> Veteran described isolating from others and avoiding activities to the point
> where he is "almost reclusive" and introverted, which is a significant
> change from his outgoing and sociable personality prior to Iraq.  He is
> prone to outbursts of anger toward co-workers, family, and others.  He
> experiences "extreme[] mood swings" that are "very intense," which he
> explained as being easily angered/enraged.  He experiences physiological
> arousal on a daily basis and is distressed by this.  He feels sad, angry, and
> moody each day and has difficulty caring about others or forming
> relationships.  He feels emotionally and psychologically distanced from
> others, "like an outcast.  Like I don't belong."  He has lost interest in
> things that used to matter to him.  He explained that he has pushed most of
> the people out of his life without really knowing why and asked, "What is
> wrong with me that makes me think this way?  Why are people running
> away from me?"

Id. at 588-90.  The examiner also noted that plaintiff was taking college classes, id. at 583, and
was employed full time in casino security, id. at 591.  With respect to plaintiff's employment, the
examiner noted that plaintiff had missed less than one week of work, for medical reasons
unrelated to his PTSD.  Id.  The examiner further noted the following problems related to
plaintiff's "occupational functioning":  "Decreased concentration, Difficulty following
instructions, Inappropriate behavior, Memory loss, Poor social interaction."  Id.

In an August 6, 2009 rating decision, the VA increased plaintiff's disability rating for his
PTSD from 50% to 70%.  Id.  It explained:

[During your PTSD review examination, y]ou described your relationship with your family as spiraling downhill since your military discharge. You reported that you are argumentative with you[r] father and have ha[d] thoughts of harming your father and his wife. Then you have associate[d] feelings of guilt. You described a turbulent relationship with your live-in girlfriend characterized with verbal and physical abuse. You noted that the two of you engage in physical violence toward one another and you noted that you don't hit one another in the face but mainly exchange "body shots." Your girlfriend was recently arrested during a domestic violence episode for striking you in the face. You also detailed the use of excessive force at work. You have found it difficult to control your anger while at your job and have been aggressive/assaultive toward others. You described yelling/arguing with others, but explained that you believed that they deserved it. You said that you slammed a person against the wall. You also reported to the examiner that you have engaged in physical altercations with your girlfriend's father. During the examination you[r] affect was described as constricted and flat. Your mood was anxious and depressed. You were shown to understand the outcomes of your behavior. You reported intermittent auditory and visual hallucinations. You reported experiencing "extreme mood swings" that are "very intense," which you explained as being easily angered/enraged. You experience physiological arousal on a daily basis and are distressed by this. You feel sad, angry, and moody each day and have difficulty caring about others or forming relationships.

You feel emotionally and psychologically distanced from others, "like an outcast." The examiner assigned a Global Assessment of Function (GAF) score of 53 due to your PTSD symptoms. You reported you are so distressed by how your life has changed that you have considered suicide and have described some plans, but denied specific intent at the time of the interview.

While the evidence demonstrates that you[r] PTSD symptoms have increased in severity beyond your 50 percent evaluation, there is no evidence of record suggesting you warrant a[] total evaluation of 100 percent.

. . . .

Since there is a likelihood of improvement, the assigned evaluation is not considered permanent and is subject to a future review examination.

Id. at 354-55; accord id. at 583-95 (containing the results of the May 21, 2009 PTSD review examination). In conjunction with the increased PTSD disability rating, the VA increased plaintiff's combined disability rating to 80%. Id. at 356.

On November 29, 2010, after two years without mental health treatment, id. at 282, plaintiff contacted the VA Medical Center in Reno:

> Veteran phoned [an] RN yesterday and was having suicidal thoughts, depression, physical and emotional abuse towards wife (x 2 yrs 'on and off'), arguing w/wife, unhappy w/job @ [redacted] doing security (12am-8am).[2]  Veteran endorsed the following chief complaints:  'Suicidal thoughts', 'Mood swings', and 'Depressed mood'.[3]

Id. at 282 (footnotes added); accord id. at 303.  He had an intake appointment the following day, and sporadically attended appointments and therapy sessions through March 2011.  See id. at 143, 210-12, 226, 244-46, 253, 256-58, 265-68, 273-79.

Then, in both March 2011 and April 2011, plaintiff was hospitalized for PTSD treatment. Id. at 110, 345.  Shortly after his April 2011 hospitalization, he submitted a claim to the VA for an increased disability rating.  Id. at 344.  He then underwent another PTSD review examination on April 27, 2011.  Id. at 577-81.  The examiner reported:

> Veteran's previous [Compensation and Pension ("C&P")] exam was on 5/21/09 . . . .  He was diagnosed with PTSD at that time and is currently 70% service-connected for this condition.  Since his previous C&P exam, veteran has had 2 psychiatric admissions at the Reno[] VA.  He reported that about a month ago, he and his wife of one year got into an argument in their home and he began choking her.  He said that she started bleeding from her nose and mouth and at that time he stopped choking her and went into the bathroom where he got the belt from a robe and was going to strangle himself.  His wife called the police.  He was on suicide watch in jail for two days, and transferred to the Reno VA.  His wife left him at that time and went to [redacted] to stay with a friend.  Veteran became suicidal again several weeks later due to the separation from his wife and was again on Ward 5C for a night.  He was charged with a felony and 2 misdemeanors.  He has a lawyer.  Veteran said that he has lost 30 pounds in the past month due to the stress of these incidents.  . . .
>
> Veteran reported that the day before this exam, he brought his wife home from [redacted].  He expressed a lot of anger toward the friend that she was

---

[2]  Defendant redacted certain information in the administrative record prior to filing it with the court.  The court indicates these redactions with a "[redacted]" notation.

[3]  A later medical record, dated February 2, 2011, indicates the reason that plaintiff "entered care" was because he called the VA Medical Center in November 2008.  Id. at 226. Given that the record of the telephone call reflects that it occurred on November 29, 2010, it is reasonable to conclude that the "November 2008" date is a typographical error.

staying with, and said that if her or another friend ("a faggot") of his wife came to his house he would kill them.  He said that as long as they stay away, he will not go after them.  He said that he has had all the firearms removed from his home because he does not trust himself with them.  I asked what he would do if his wife left again and went to [redacted] to stay with this friend, and his reply was that "she won't."  Veteran reported a history of many physical altercations, including one in [redacted] in late 2009 where he beat an ex of his wife "within an inch of his life."  He said that he contemplated killing him, but did not.  He said that he has also got into other physical altercations, but he has not been arrested for them.  His impulse control is very poor.  He said that the biggest difference between his previous C&P exam and the exam today is that back then he "had the restraint to control myself."  He has threatened his manager at work which has resulted in his shift time being changed.

Veteran reported that he is 6 classes away from a degree in criminal justice through the University of Phoenix.  He had to drop out of his classes this semester due to his psychiatric and legal problems.  He does not drink or use drugs.  He works full time in security at [redacted] Casino.  He said that he often calls in sick because he does not want to work with his co-workers.  He worked at [redacted] in security until the summer, when he was fired due to personality conflicts.

Veteran reported some benefit with his psychotherapy with Dr. Golden in late 2010.  He said that he connected well with Dr. Golden.  Dr. Golden moved so this was terminated.  Veteran currently takes prazosin, citalopram, mirtazapine, and valproic acid.  He reported that the prazosin helps his nightmares, and the rest of medications help to bring him to a "calmer state."

Veteran reported that he speaks with his mother, stepfather, and grandmother on occasion, but he has been avoiding them lately because he does not want to talk.  He said that he has a "handful of friends."

Veteran was on time for the appointment.  He was dressed casually.  His affect was constricted, and his mood was irritable.  He answered all questions presented.  He used chew and texted during the interview.  He reported that he was not having suicidal ideation today.  He reported that he has homicidal ideation toward friends of his wife, but he is not planning to go after them in any way; however, if they come to his home he said that he would kill them ("slit their throats, cut their face off.")[.]  He endorsed paranoia and auditory hallucinations of someone saying his name.  Veteran reported a very quick temper and has a history of violent behavior.  There was no obvious impairment in his cognitive

functioning, although he reported that his short-term memory is not as good as it
once was.

Id. at 578-79.

Upon reviewing plaintiff's treatment records and the results of the PTSD review
examination, the VA denied plaintiff's claim.  Id. at 344.  In an August 10, 2011 rating decision,
the VA explained:

> VA records show hospitaliz[ation] for posttraumatic stress disorder treatment
> from March 21, 2011 to April 4, 2011, which is a period of less than 21 days.
> This admission does not meet the 21 day criterion for a temporary total evaluation
> for hospitalization.  Treatment records show complaints of violent behavior
> including domestic violence, anger control issues, depressed mood, irritability,
> startle reaction, and intrusive thoughts.  VA examination noted history of
> domestic violence, serious anger control issues, nightmares, poor impulse control,
> avoidance of relatives in recent months, with ongoing therapy and medication
> management, as well as two recent hospital admissions.  Veteran had been able to
> obtain and maintain employment in security.  On examination, veteran had
> adequate dress and grooming.  Affect was constricted and mood was irritable.
> Cognition appeared intact.  Veteran did report homicidal ideation and paranoia.
> Cognitive functioning was good.  Memory was indicated as somewhat impaired.
> Veteran also endorsed sleep impairment and panic attacks less than weekly.
> Diagnosis was posttraumatic stress disorder.  Intermittent explosive disorder and
> psychotic disorder were ruled out.  Examiner indicated occupational and social
> impairment with deficiencies in most areas, with assessment of functioning
> indicated as 48.  Findings meet the criteria for a 70 percent evaluation, but not
> higher, so we have continued the existing 70 percent evaluation.

Id. at 345-46.

### D.  Proceedings Before This Court and the Physical Disability Board of Review

Plaintiff filed suit in this court on July 29, 2013,[4] seeking the correction of his military
records to reflect the assignment of a 50% disability rating effective July 30, 2007–the date of his
discharge from the Army–and the receipt of the benefits that would follow from such a
correction.  More specifically, plaintiff contended that the PEB should have assigned him a
disability rating of at least 50% and recommended that he be permanently retired.  Compl. ¶¶ 55-
57.  He relied upon VASRD § 4.129, "Mental disorders due to traumatic stress," which provides:

---

[4]  The administrative record does not contain any medical records or other documents
dated between August 2011 and July 2013.

> When a mental disorder that develops in service as a result of a highly stressful event is severe enough to bring about the veteran's release from active military service, the rating agency shall assign an evaluation of not less than 50 percent and schedule an examination within the six month period following the veteran's discharge to determine whether a change in evaluation is warranted.

38 C.F.R. § 4.129 (2006).[5]

Proceedings in this case were subsequently stayed to permit plaintiff to seek relief before the Physical Disability Board of Review ("PDBR").  Created by Congress in January 2008, the PDBR is charged with reviewing the findings and decisions of PEBs for former service members, like plaintiff, who were medically separated from service between September 11, 2001, and December 31, 2009, with a disability rating of 20% or less.  10 U.S.C. § 1554a(a)-(b) (2012).  Upon such a review, the PDBR may make the following recommendations to the Secretary of the pertinent military department:

> (1)  No recharacterization of the separation of such individual or modification of the disability rating previously assigned such individual.

> (2)  The recharacterization of the separation of such individual to retirement for disability.

> (3)  The modification of the disability rating previously assigned such individual by the Physical Evaluation Board concerned, which modified disability rating may not be a reduction of the disability rating previously assigned such individual by that Physical Evaluation Board.

> (4)  The issuance of a new disability rating for such individual.

Id. § 1554a(d).  The Secretary concerned is authorized to correct the military records of the former service member in accordance with the PDBR's recommendation.  Id. § 1554a(e)(1).

Plaintiff submitted his application to the PDBR on November 4, 2013, along with a supporting brief, the records described above, his declaration, and a declaration submitted in a related case by another individual.  See generally ARII 12-340.  In his supporting brief, plaintiff advanced two main arguments.  See id. at 24-33.  First, he contended that he was entitled, as a matter of law, to a 50% disability rating for his PTSD beginning on the date of his discharge in 2007, and continuing until the Army provided him with a follow-up PTSD examination and subsequent PEB.  Id. at 24-29.  Second, he contended that he was entitled to a 50% disability

---

[5]  The court cites to the 2006 version of the VASRD–the version in effect at the time of plaintiff's discharge.  However, the sections of the VASRD discussed in this Opinion and Order were not substantively amended between 2006 and the date that plaintiff filed his complaint.

rating for his PTSD based on the degree of his social and occupational impairment, as reflected in his VA records.  Id. at 29-32.

In his declaration, plaintiff described his exposure to three dead enemy combatants and close proximity to an improvised explosive device detonation during his first deployment to Iraq, id. at 37-39, and the death of seven of his friends and fellow soldiers over a five-week period during his second deployment to Iraq, id. at 39.  He also described the effects that PTSD had on his life after he was separated from the Army:

> 18.  Following my discharge from the Army and even during and after the second VA Rating Decision in August 2009, I noticed that my PTSD and depression got worse and my relationships with family members, co-workers and friends continued to deteriorate.

> 19.  After my discharge from the Army, I initially found employment as a member of the security team at [redacted] casino.  However, I found myself frequently angry or annoyed at co-workers and even customers at work, and was informed by my supervisors that I was at times too aggressive at my job, which they did not like.  In July 2010, I was dismissed from this job due to "personality conflicts."

> . . . .

> 22.  After my return from Iraq and subsequent discharge from the Army, my personal relationships with friends and family members deteriorated significantly, and I started to notice that I was the common denominator in all these failed relationships.  Where I once enjoyed going out with friends and being social, I became introverted and did not like going out anymore.  I did not feel like I fit in, and felt like an outcast.  My quality of life suffered greatly.  I could not sleep for more than a couple hours at a time, waking frequently and feeling anxious.  I often had nightmares when asleep and was anxious and angry when awake.  Suicide had crossed my mind during this time.  I remembered the violent deaths of my friends in the Army.

> 23.  Following my return from Iraq and discharge, I had particular difficulty in managing and keeping my close relationships.  I had anger control issues and was often in a depressed mood, and was easily irritated.

> 24.  A critical point during my marriage, which was a wake up call for me, was in March 2011, when I got into a physical fight with my wife.  I tried to strangle her.  During the fight, I saw blood on her, which made me stop and put a robe belt around my neck in an attempt to suffocate and kill myself.  I knew I was wrong and specifically asked the police to arrest me and take me to jail.

25.  The March 2011 incident was the first time I had ever been arrested, and the experience of going to jail was very tough for me.  In jail, I was placed in isolation and on suicide watch.

. . . .

27.  Also following the March 2011 incident with my wife, I was admitted to a VA hospital two times within the span of two weeks between March and April 2011, for treatment of mental issues relating to my PTSD.

28.  Following my return from Iraq and subsequent discharge from the Army, another relationship that was important to me, my relationship with my father, also deteriorated.  Specifically, I had a generally good relationship with my father while growing up; however, after returning from Iraq and being discharged from the Army in 2007, my relationship with my father suffered to a point where I became estranged from my father and his wife.  During that time, I found myself at times contemplating physical violence against my father, which was strange because I had not had those kinds of thoughts before.  We stopped speaking on January 11, 2008, and did not speak again until more than four years later.

29.  I feel responsible for the deterioration of the relationship with my father because I purposefully said hurtful things to him.  I also feel responsible for the other failed relationships that I have had since returning from Iraq and being discharged from the Army.

Id. at 41-44.  Plaintiff also provided an explanation for why he did not show up for two scheduled PTSD review examinations in 2008, after the VA issued its first rating decision:

I don't specifically recall the circumstances surrounding why I missed those appointments, however I recall there was a lot of uncertainty and instability going on in my life at that time, which may have had something to do with my PTSD. In particular, during the time between the [November 2007 and August 2009 disability] ratings, I was staying with my cousin, who I was not getting along with very well at the time.  Therefore, I only stayed with him intermittently, and otherwise spent most of my time at my girlfriend's home.  Therefore, I did not get most of my mail on a timely basis, if at all.

Id. at 41.  The remaining information contained in plaintiff's declaration was consistent with the contents of his VA medical records, as described above.

The PDBR convened on March 20, 2014, to review plaintiff's case.  Id. at 5-6.  In its April 4, 2014 report, the members of the PDBR unanimously agreed to recommend the correction of plaintiff's military records to reflect a 50% disability rating and placement on the

TDRL for six months.  Id. at 8.  After summarizing the evidence before it, id. at 7-8, the PDBR explained:

>       The Board . . . directed its attention to the question of §4.129 applicability and the rating recommendations based on the evidence just described.  The PEB rated the [mental health] condition(s) at 10% . . . (likely [in accordance with Department of Defense Instruction ("DoDI") 1332.39, "Application of the Veterans Administration Schedule for Rating Disabilities" (Nov. 14, 1996)] [rescinded] and/or [Army Regulation] 635-40 in effect at the time).  The VA . . . assigned a 50% rating based on §4.129. . . .  The PEB rating . . . preceded the promulgation of the National Defense Authorization Act (NDAA) 2008 mandate for Department of Defense (DoD) adherence to Veterans Administration Schedule for Rating Disabilities (VASRD) §4.129.  The Board, [in accordance with] DoDI 6040.44 and DoD guidance (which applies current VASRD §4.129 to all Board cases as appropriate), accepts the §4.129 specification that it is applicable to any "mental disorder that develops in service as a result of a highly stressful event [that] is severe enough to bring about the veteran's release from active military service"; and[] the Board unanimously agreed that the operant definition was met by the psychiatric conditions evidenced in this case.

>       . . . .  All members agreed that the §4.130 criteria for a rating higher than 50% were not met at the time of separation and therefore the minimum Temporary Disability Retired List (TDRL) rating is applicable[, and] will thus recommend a 50% PTSD rating for a retroactive six-month period on the TDRL.

Id. at 8-9 ("[rescinded]" notation in the original); see also 38 C.F.R. § 4.130 (containing VASRD § 4.130, "Schedule of ratings–mental disorders," which sets forth the "general rating formula for mental disorders," in other words, guidance for assigning 10%, 30%, 50%, 70%, and 100% disability ratings).

However, the members of the PDBR were unable to arrive at a unanimous recommendation regarding the disability rating that should have been assigned to plaintiff six months after his separation.  See ARII at 8-11.  The majority of the PDBR members recommended that plaintiff's disability rating be set at 30%, explaining:

>       Regarding the rating at the beginning of a constructive TDRL period, the mental health addendum evaluation performed 3 months prior to separation recorded a completely normal [mental status evaluation] and a GAF of 60 (borderline moderate to mild).  There were no recorded visits to the emergency room, no suicidal or homicidal ideations, no panic attacks, and no psychiatric hospitalizations.  There was no evidence of impairment in thinking or judgment. The Board considered the commander's statement that "the severity of the conditions has placed great difficulties and stresses on the soldier, severely

limiting his ability to work" in his primary MOS, but when reassigned the [covered individual's ("CI's")] duty performance had "been exemplary"; he worked a 40-hour work week and attended therapy appointments. As previously noted, the VA psychiatric C&P examination was approximately 2 years after separation and was assigned less probative value as related to the CI's functional status at the start of the constructive [TDRL] period. The Board majority felt that the [MEB narrative summary ("NARSUM")] examination and record of evidence was most consistent with the general description for a §4.130 rating of 30% for "occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks," as demonstrated by such symptoms as depressed mood, suspiciousness, mild memory impairment and anxiety . . . .

Regarding the rating at the end of a constructive six month TDRL period (30 January 2008), the Board placed higher probative value to the NARSUM and less to the delayed VA C&P mental examination (completed approximately 16 months after the rating timeframe)[] in deliberating the permanent disability rating. The Board noted that at the time of the NARSUM and within 12 months of separation, the CI had no history of psychiatric hospitalizations, had minimally engaged in therapy, was not taking psychotropic medications, made no suicidal or homicidal attempts and had no visits to the emergency room for suicidal, homicidal ideations, or panic attacks. While noting the VA C&P examination indicated increasing violence (history indicated that police were called in the Fall of 2008 resulting in the arrest of his girlfriend) and deficiencies in family relations beginning in early 2008 (proximate to the end of TDRL rating timeframe), there was no evidence of legal charges or legal consequences to the CI, he was working full-time, and had been a student. The Board adjudged that the CI's condition at the remote VA exam was post-separation worsening and not indicative of the CI's level of impairment at the 6-month post-separation timeframe for permanent rating determination following constructive TDRL. After due deliberation, and in consideration of all the evidence and VASRD §4.3 (reasonable doubt), the Board majority recommends a 30% permanent disability rating.

Id. at 8-9. A minority of the PDBR members disagreed, finding that a 10% disability rating for plaintiff's PTSD after six months was appropriate:

The Board correctly placed the applicant on the TDRL using §4.129 at 50%; however, there were no evaluations at or near the 6 month time period that could be effectively used to rate the applicant. The applicant failed to report for his initially scheduled VA C&P Mental Disorders Exam following separation; therefore, the VA invoked §4.129 at 50% citing service treatment records identifying a diagnosis of PTSD. The applicant also failed to report for a second Mental Disorders exam in late 2008, approximately 14 months after separation.

Based on this second missed exam, the VA proposed reducing the PTSD award from 50% to 0%.  The applicant responded to this proposed reduction and a C&P review for PTSD was conducted in May 2009, 22 months after separation.

Review of the PEB's discussion for the applicant's PTSD indicates that he was working a full 40 hour week with acceptable duty performance.  That comment most likely came from the commander's statement, written one month prior to the PEB in which he wrote, "SPC Cook's duty performance has been exemplary.  His work ethic and adherence to standards are in compliance with Army regulations.  He has been known as a technically proficient soldier."  The commander further stated that he was working a 40-hour work week.

The mental health addendum to the narrative summary (NARSUM), written 2 months prior to the PEB was difficult to follow with respect to definitively categorizing the applicant at either the 10% or 30% rating category.  The NARSUM, written a month later, states that the applicant was not taking any psychiatric medications, had not required any psychiatric hospitalizations, and denied any current suicidal or homicidal thoughts, plans or ideations.

The PEB adjudicated the PTSD as unfitting, rating the condition at 10% and having mild industrial impairment.  Given the documentation available, the minority voter believes that 10% was a fair and equitable rating at the time of separation.  However, there is no documentation [that] can be used at the end of the 6-month TDRL period to adequately, effectively, and fairly rate the applicant as the first evidence we have of continued problems with PTSD are not documented until 22 months after separation.

Once a service member is [medically] separated or retired from the Military because of an unfitting condition(s), the current system is designed to support any deterioration of the unfitting condition(s) via the VA.  The initial VA award was based on the Army's unfitting diagnosis of PTSD and §4.129.  However, we do not know what that award would have been if the applicant had reported for his initial C&P exam.  To compound matters, the applicant missed a second C&P exam and did not get a "true" VA rating until he was examined 22 months after separation.  The minority voter opines that there are no probative exams at 6, 12, or 18 months after separation time period upon which to rate the applicant at the end of the TDRL period.  Therefore, minority voter believes that the PEB's rating of 10% would be the fairest adjudication of the applicant's condition at the end of the 6-month TDRL period.

Id. at 11.

The president of the PDBR forwarded the PDBR's findings and recommendations to the Director of the Army Review Boards Agency, the Secretary of the Army's designee for acting on the recommendations of the PDBR.  Id. at 3-5.  In an April 14, 2014 memorandum, the Director wrote:

> I have reviewed the enclosed Department of Defense Physical Disability Board of Review . . . recommendation and record of proceedings pertaining to the subject individual.  Under the authority of Title 10, United States Code, section 1554a, I reject the Board's recommendation and accept the Board's minority opinion as accurate that the individual be constructively placed on the Temporary Disability Retired List . . . at 50% disability for six months effective the date of the individual's original medical separation for disability with severance pay and then following this six month period no recharacterization of the individual's separation or modification of the permanent disability rating of 10%.  There is insufficient justification to support the Board's recommendation in accordance with Army and Department of Defense regulations.

Id. at 3.  She then directed that plaintiff's military records be corrected in accordance with her decision.  Id.

Plaintiff was not satisfied with the relief provided by the Army.  Accordingly, he filed an amended complaint in this action on May 9, 2014, setting forth two claims for relief.  First, plaintiff alleges that the Army's failure in 2007 to (1) assign him a 50% disability rating for his PTSD upon his discharge, (2) place him on the TDRL, (3) schedule a reexamination within six months after his discharge, and (4) "afford him a subsequent PEB with all the associated procedural rights required for a full and fair hearing" was "arbitrary, capricious, and contrary to law."  Am. Compl. ¶ 83; see also id. ¶ 82 (alleging that the Army acted in contravention of 10 U.S.C. § 1201, 10 U.S.C. § 1203, and the VASRD).  Second, plaintiff alleges that the Army's decision in 2014 "to reject the PDBR's majority recommendation to recharacterize Plaintiff's separation as a permanent retirement by assigning Plaintiff a PTSD disability rating of 30% at the six month mark following Plaintiff's discharge, despite substantial evidence in the record warranting such rating, was arbitrary, capricious, and contrary to law."  Id. ¶ 88.  Plaintiff accordingly requests that his military records be corrected to reflect that he was assigned (1) "a 50% permanent disability rating for unfitting PTSD effective at discharge from the military and awarded monetary benefits associated with this records correction" or (2) "a 50% temporary disability rating for his unfitting PTSD at discharge and a 30% permanent disability rating for his unfitting PTSD effective at the six month mark following [his] discharge from the military and awarded monetary benefits associated with this records correction."  Id. at 24-25.

Defendant moves to dismiss plaintiff's first claim for relief, and the parties cross-move for judgment on the administrative record with respect to both of plaintiff's claims for relief.  Defendant also moves to strike a declaration attached to plaintiff's reply brief.  All motions have been fully briefed and the court deems oral argument unnecessary.

## II.  DEFENDANT'S MOTION TO DISMISS

Defendant initially moves, pursuant to Rule 12(b) of the Rules of the United States Court of Federal Claims ("RCFC"), to dismiss plaintiff's first claim for relief as moot or, in the alternative, for failure to state a claim upon which relief can be granted.  In ruling on such a motion, the court assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).

### A.  Plaintiff's First Claim for Relief Is Not Moot

Defendant raises its mootness argument in a motion to dismiss for lack of jurisdiction pursuant to RCFC 12(b)(1).  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Powell v. McCormack, 395 U.S. 486, 496 (1969).  When a case is moot, there are no justiciable issues upon which the court can render a decision.[6]  Flast v. Cohen, 392 U.S. 83, 95 (1968); see also Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (panel portion) (noting that justiciability "encompasses a

---

[6]  The "lack of jurisdiction to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy."  Liner v. Jafco, Inc., 375 U.S. 301, 306 n.3 (1964); see also U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties . . . [and] to Controversies to which the United States shall be a Party . . . .").  But see Honig v. Doe, 484 U.S. 305, 329-32 (1988) (Rehnquist, C.J., concurring) (questioning the constitutional origins of the mootness doctrine by arguing that despite federal courts' recognition of exceptions to mootness, such exceptions cannot be read into Article III's "case or controversy" requirement); Winzler v. Toyota Motor Sales U.S.A., Inc., 681 F.3d 1208, 1209 (10th Cir. 2012) ("Mootness has many moods. . . .  In some cases mootness bears a constitutional countenance, acting as a jurisdictional bar against even entertaining a case.  Other times mootness carries a more prudential complexion, permitting us to withhold relief we have the authority to grant.  Other times still, a case finds itself mooted by a tangle of constitutional and prudential considerations. . . .  Whether, when, and to what degree mootness can boast of being a constitutional command, a true jurisdictional limit on the federal courts, has taxed great minds."); Matthew I. Hall, The Partially Prudential Doctrine of Mootness, 77 Geo. Wash. L. Rev. 562, 575 (2009) (arguing "that if the mootness bar were truly a mandatory, jurisdictional rule imposed by the Constitution, then the exceptions . . . could not exist").  The United States Court of Federal Claims ("Court of Federal Claims"), as a court established under Article I of the United States Constitution, 28 U.S.C. § 171(a) (2012), is not bound by the "case or controversy" requirement of Article III, Zevalkink v. Brown, 102 F.3d 1236, 1243 (Fed. Cir. 1996).  Nevertheless, the Court of Federal Claims and other Article I courts traditionally have applied the "case or controversy" justiciability doctrines.  See id.; Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003); CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 558 (2000); cf. 28 U.S.C. § 2519 (using the phrase "case or controversy" in describing the finality of judgments of the Court of Federal Claims).

number of doctrines under which courts will decline to hear and decide a cause," including the "doctrines of standing, mootness, ripeness, and political question"). The court's inquiry into the justiciability of a case is distinct from its inquiry into whether it has jurisdiction over the case's subject matter. Powell, 395 U.S. at 512; Baker v. Carr, 369 U.S. 186, 198 (1962); Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1335 n.3 (Fed. Cir. 2008); Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993). In other words, the court may find that it possesses jurisdiction over the subject matter of a case but conclude that the dispute is nevertheless nonjusticiable. Thus, while mootness is jurisdictional in that it triggers the court's inquiry as to whether it has the ability to adjudicate a case,[7] an RCFC 12(b)(1) motion has not been universally accepted by federal courts as the appropriate vehicle by which to dismiss a case as moot.[8] Ultimately, however, the court need not determine whether defendant should have asserted, in its motion to dismiss plaintiff's first claim for relief as moot, that plaintiff failed to state a claim upon which relief can be granted, that plaintiff failed to state a nonjusticiable claim, or that

--------

[7] See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-10 (1988) (characterizing the justiciability issue of standing as a jurisdictional issue); North Carolina v. Rice, 404 U.S. 244, 246 (1971) (per curiam) ("Mootness is a jurisdictional question because the Court is not empowered to decide moot questions or abstract propositions . . . ." (internal quotation marks omitted)); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[M]ootness . . . is a threshold jurisdictional issue."); White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Because standing and mootness both pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6)."); CBY Design Builders v. United States, 105 Fed. Cl. 303, 328 (2012) ("The mootness of a case is properly the subject of an RCFC 12(b)(1) motion.").

[8] See, e.g., Baker, 369 U.S. at 196 (holding that a case that is "unsuited to judicial inquiry or adjustment" should be dismissed for "a failure to state a justiciable cause of action" and not for "a lack of jurisdiction of the subject matter"); Oryszak v. Sullivan, 576 F.3d 522, 526-27 (D.C. Cir. 2009) (Ginsburg, J., concurring) (noting that when "a plaintiff makes a claim that is not justiciable . . . a court should dismiss the case for failure to state a claim" and that "it is important to distinguish among failure to state a claim, a claim that is not justiciable, and a claim over which the court lacks subject matter jurisdiction"); F. Alderete Gen. Contractors, Inc. v. United States, 715 F.2d 1476, 1480 (Fed. Cir. 1983) (reciting "the long-standing rule in the Federal courts that jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties" (emphasis added)); see also Kontrick v. Ryan, 540 U.S. 443, 455 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' . . . only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority."); Sierra Club v. Jackson, 648 F.3d 848, 853 (D.C. Cir. 2011) ("The distinction between a claim that is not justiciable because relief cannot be granted upon it and a claim over which the court lacks subject matter jurisdiction is important.").

plaintiff asserted a claim outside the court's subject matter jurisdiction because plaintiff's first claim for relief is not moot.

In his first claim for relief, plaintiff challenges the informal PEB's failure to apply VASRD § 4.129 to his circumstances, depriving him of a 50% disability rating for his PTSD, a reexamination within six months to determine whether the disability rating should be adjusted, and a second PEB to address his disability rating.[9]  Defendant contends that this claim for relief is moot because the Army, relying on the PDBR's minority opinion, has retroactively corrected plaintiff's military records to provide plaintiff with the relief contemplated by VASRD § 4.129. As such, defendant argues, there is no longer a live controversy regarding the application of VASRD § 4.129 to plaintiff.  Plaintiff disagrees, arguing that a live controversy remains because notwithstanding the Army's correction of his military records, the Army has not fully complied with the relevant statutes and regulations.  In particular, plaintiff asserts that the Army has not provided him with the postdischarge reexamination required by VASRD § 4.129 or followed the proper procedures for reviewing and/or changing plaintiff's disability rating following the required postdischarge reexamination.  In a nutshell, plaintiff contends that the Army's correction of his records did not provide him with the full relief to which he was entitled.

A court "will determine only actual matters in controversy essential to the decision of the particular case before it."  United States v. Alaska S.S. Co., 253 U.S. 113, 115 (1920).  The controversy must exist at all stages of the litigation; it is not enough that the controversy was alive when the complaint was filed.  Steffel v. Thompson, 415 U.S. 452, 459 n.10 (1974).  A party's subsequent acts will render a case moot if those acts make it impossible for the court to grant "'effectual relief.'"  Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)).  However, because the "[m]ootness of an action relates to the basic dispute between the parties" and "not merely the relief requested," a case will not be rendered moot by subsequent acts if some of the requested relief remains

_____

[9]  Soldiers placed on the TDRL must undergo a physical examination at least once every eighteen months "to determine whether there has been a change in the disability for which he was temporarily retired."  10 U.S.C. § 1210(a); Army Regulation 635-40, ¶ 7-4.  The physical examination is conducted at a medical treatment facility.  Army Regulation 635-40, ¶ 7-13.  The results of the examination are forwarded to the PEB, id. ¶ 7-19(c), which determines whether the soldier's condition has changed since being placed on the TDRL, id. ¶ 7-20(b) to (c).  The PEB may only change a soldier's disability rating upon the soldier's removal from the TDRL.  Id. ¶ 7-20(b).  If the PEB recommends a soldier's removal from the TDRL, the soldier is entitled to counseling from a PEB liaison officer and may make any of the elections set forth on DA Form 199.  Id. ¶ 7-20(e)(1), (3); see also id. ¶ 4-20(c)(1) (describing the available options on DA Form 199 as (1) concurring with the findings and recommendations and waiving a formal hearing; (2) disagreeing with the findings and recommendations, submitting a rebuttal statement, and waiving a formal hearing; (3) demanding a formal hearing; and/or (4) having representation by counsel if a hearing is demanded).  Removal of a soldier from the TDRL upon the PEB's recommendation is done by the Army's Human Resources Command.  Id. ¶ 7-11(a).

available.  Intrepid v. Pollock, 907 F.2d 1125, 1131 (Fed. Cir. 1990); accord Church of Scientology of Cal., 506 U.S. at 12 (holding that a case is not moot so long as the "court can fashion some form of meaningful relief" for the injured party).

The subsequent act at issue here is the Army's correction of plaintiff's military records. With this act, the Army provided plaintiff with some of his requested relief–it retroactively assigned him a 50% disability rating for his PTSD and constructively placed him on the TDRL for six months.  However, the Army's correction of plaintiff's military records did not affect the remaining relief that plaintiff requests–a reexamination of his mental health condition pursuant to VASRD § 4.129, and the convening of a PEB to review and, if necessary, change the 50% disability rating for his PTSD.  If plaintiff prevails on his claim that the Army's failure to order a reexamination of his mental health and convene another PEB was "arbitrary, capricious, and contrary to law," the court has the authority to remand plaintiff's case to the Army to correct the defect.  28 U.S.C. § 1491(a)(2).  Moreover, if the court concludes that the Army violated the relevant statutes and regulations by not requiring a physical examination and convening a PEB, and that, as a result, plaintiff is entitled to be permanently retired under 10 U.S.C. § 1201, then it is authorized to issue an order directing the Army to place plaintiff in the appropriate retirement status and correct plaintiff's miliary records accordingly.  Id.  In sum, because relief remains available for plaintiff's first claim for relief, that claim is not moot.

## B.  Plaintiff's First Claim for Relief States a Claim Upon Which Relief Can Be Granted

Defendant moves, in the alternative, to dismiss plaintiff's first claim for relief for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).  To survive such a motion, a plaintiff must include in his complaint "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl., 550 U.S. at 556).  Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

As previously noted, plaintiff's first claim for relief concerns the actions taken, and not taken, by the Army in 2007 when it assigned plaintiff a 10% disability rating for his PTSD and separated him with severance pay.  Defendant argues that plaintiff fails to state a claim upon which relief can be granted because the Army was not required, prior to 2008, to apply VASRD § 4.129 to soldiers deemed unfit for duty due to PTSD.  Defendant is mistaken.

### 1.  The Pre-2008 Statutory and Regulatory Framework

In 2007, when plaintiff was discharged from the Army, a soldier with at least thirty days of active duty service who was deemed unfit for duty could either be permanently retired

pursuant to 10 U.S.C. § 1201, placed on the TDRL pursuant to 10 U.S.C. § 1202, or separated pursuant to 10 U.S.C. § 1203.  If the Secretary of the Army determined that the soldier's "disability [was] at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination," the soldier could be permanently retired, 10 U.S.C. § 1201(b)(3)(B) (2006), or placed on the TDRL, id. § 1202 (incorporating the standards set forth in 10 U.S.C. § 1201).  If the Secretary of the Army determined that the soldier's "disability [was] less than 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination," the soldier could be separated.  Id. § 1203(b)(4)(A)-(B); see also id. § 1203(b)(4)(C) (noting that separation was possible in certain circumstances if a soldier's "disability [was] at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination").  In other words, the Army was statutorily required to utilize the VASRD to determine the disability rating of a soldier with an unfitting medical condition.[10]  Accord Army Regulation 635-40, ¶ B-1 ("Congress established the VASRD as the standard under which percentage rating decisions are to be made for disabled military personnel."); DoDI 1332.39, ¶ 4.2 ("Chapter 61 of [title 10 of the United States Code] establishes the [VASRD] as the standard for assigning percentage ratings.").

The Secretary of the Army is charged with promulgating regulations to carry out the provisions of chapter 61 of title 10 of the United States Code.  10 U.S.C. § 1216(a).  Moreover, except in circumstances not relevant in this case, the Secretary of the Army has "all powers, functions, and duties incident to the determination" of:

> (1)  the fitness for active duty of any member of an armed force under his jurisdiction;
>
> (2)  the percentage of disability of any such member at the time of his separation from active duty;
>
> (3)  the suitability of any member for reappointment, reenlistment, or reentry upon active duty in an armed force under his jurisdiction; and
>
> (4)  the entitlement to, and payment of, disability severance pay to any member of an armed force under his jurisdiction.

Id. § 1216(b).  Pursuant to this authority, the Secretary of the Army promulgated Army Regulation 635-40.  That regulation provided:

---

[10]  Other sections of the pre-2008 version of chapter 61 of title 10 of the United States Code contain language similar to that appearing in sections 1201 and 1203 directing the military to utilize the VASRD to determine disability ratings.  See, e.g., 10 U.S.C. §§ 1204(4)(B), 1206(5), 1210(c)-(e).

a.  The percentage assigned to a medical defect or condition is the disability rating.  A rating is not assigned until the PEB determines the Soldier is physically unfit for duty.  Under the provisions of 10 USC [ch.] 61 these ratings are assigned from the Department of Veterans Affairs Schedule for rating disabilities (VASRD).

b.  Special guidance concerning Army use of the VASRD, as well as modifications and exceptions to it as prescribed by [Department of Defense Directive ("DoDD") 1332.18, "Separation or Retirement for Physical Disability" (Nov. 4, 1996)],[11] are set forth in appendix B of this regulation.

Army Regulation 635-40, ¶ 3-5 (footnote added); accord id. ¶ 4-19(f)(5) ("If the Soldier is entitled to disability benefits, the PEB decides the rating for each compensable disability from the VASRD, as modified by Appendix B."); DoDI 1332.38, ¶ E3.P4.6 ("When a disability is established as compensable, the disability shall be rated according to the VASRD, as implemented by DoD Instruction 1332.29 . . . and federal law.").  Another paragraph of the regulation contained additional guidance regarding the Army's modifications and exceptions to the use of the VASRD:

The VASRD, as modified by appendix B of this regulation, is used in deriving percentage ratings.  The first 31 paragraphs of the VASRD, which provide general policies, do not apply and have been replaced by section I and II of appendix B of this regulation.  [PEB liaison officers], raters, and reviewers must be familiar with the VASRD, including introductory paragraphs to sections and italicized footnotes.  Appendix B sets forth Army policies (including modifications) on use of the VASRD when rules or ratings provided by the VA schedule are improper for Army use or do not provide a rating basis.

Army Regulation 635-40, ¶ 4-19(i); accord id. ¶ B-2 (noting that section I of appendix B "replace[d] or modifie[d] paragraph[s] 1-31 of the VASRD"); DoDI 1332.39, ¶ 4.2 ("[N]ot all the general policy provisions in Sections 4.1 - 4.31 of the VASRD are applicable to the Military Departments. . . .  This Instruction replaces these sections of the VASRD.  The remainder of the VASRD is applicable except those portions that pertain to [VA] determinations of Service connection, refer to internal [VA] procedures or practices, or are otherwise specifically identified in Enclosure 2 as being inapplicable."[12]).

---

[11]  Paragraph 3.8 of DoDD 1332.18 provided that "[t]he assignment of disability ratings shall be based on the Veterans Administration Schedule for Rating Disabilities (VASRD) . . . as implemented by" DoDI 1332.38, "Physical Disability Evaluation" (Nov. 14, 1996), and DoDI 1332.39, "Application of the Veterans Administration Schedule for Rating Disabilities."

[12]  The portions of the VASRD pertaining to PTSD and other mental disorders were not mentioned in Enclosure 2.

One of the policies set forth in the first thirty-one paragraphs of the VASRD that was rejected by the Army concerned convalescent ratings.  VASRD § 4.30 provides:

> Convalescent ratings.
>
> A total disability rating (100 percent) will be assigned without regard to other provisions of the rating schedule when it is established by report at hospital discharge (regular discharge or release to non-bed care) or outpatient release that entitlement is warranted under paragraph (a) (1), (2) or (3) of this section effective the date of hospital admission or outpatient treatment and continuing for a period of 1, 2, or 3 months from the first day of the month following such hospital discharge or outpatient release.  . . .
>
> (a)  Total ratings will be assigned under this section if treatment of a service-connected disability resulted in:
>
>> (1)  Surgery necessitating at least one month of convalescence.  . . .
>>
>> (2)  Surgery with severe postoperative residuals such as incompletely healed surgical wounds, stumps of recent amputations, therapeutic immobilization of one major joint or more, application of a body cast, or the necessity for house confinement, or the necessity for continued use of a wheelchair or crutches (regular weight-bearing prohibited).  . . .
>>
>> (3)  Immobilization by cast, without surgery, of one major joint or more.  . . .

38 C.F.R. § 4.30.  And, with respect to mental disorders, VASRD § 4.128 further provides:

> Convalescence ratings following extended hospitalization.
>
> If a mental disorder has been assigned a total evaluation due to a continuous period of hospitalization lasting six months or more, the rating agency shall continue the total evaluation indefinitely and schedule a mandatory examination six months after the veteran is discharged or released to nonbed care.

Id. § 4.128.  The Army rejected the VASRD's use of convalescent ratings in appendix B of Army Regulation 635-40:

> Convalescent ratings
>
> Under certain diagnostic codes, the VASRD provides for convalescent ratings to be awarded for specified periods of time without regard to the actual

degree of impairment of function.  Such ratings do not apply to the Military
Departments since the purpose of convalescent ratings is accomplished by other
means under disability laws.  Convalescence will ordinarily have been completed
by the time optimum hospital improvement (for disposition purposes) has been
attained.

Army Regulation 635-40, ¶ B-7; accord DoDI 1332.39, ¶¶ 6.7-6.8.  Of particular importance in
this case, the Army issued substantially identical policy memoranda to the presidents of its PEBs
in 2002 and 2005 in which it declared that the 50% disability rating set forth in VASRD § 4.129
was a convalescent rating, and that, therefore, it would not use VASRD § 4.129 when assigning
disability ratings to soldiers deemed unfit for duty due to PTSD.  See United States Army
Physical Disability Agency, Memorandum for Physical Evaluation Board Presidents, "Policy/
Guidance Memorandum #7:  The Department of Veterans Affairs Schedule for Rating
Disabilities (VASRD) Ratings for Mental Disorders, Narcolepsy, and Sleep Apnea Syndrome,"
Enclosure 1, ¶ 1(e) (Feb. 25, 2005) ("The Army does not use convalescent ratings.  Paragraph
4.129 . . . is essentially a convalescent rating and will not be used."); United States Army
Physical Disability Agency, Memorandum for Physical Evaluation Board Presidents, "Policy/
Guidance Memorandum #7:  The Department of Veterans Affairs Schedule for Rating
Disabilities (VASRD) Ratings for Mental Disorders, Narcolepsy, and Sleep Apnea Syndrome,"
¶ 4(a)(5) (Apr. 8, 2002) (same).  It further bears noting that the Army distinguished convalescent
ratings from observation ratings and minimum ratings, both of which it would apply in the
appropriate circumstances.  See Army Regulation 635-40, ¶¶ B-7 ("The ratings for observation
periods, as distinguished from convalescence, such as those "for one year" following treatment
. . . , are not affected by this policy."), B-15(b) ("In some instances the VASRD provides a
'minimum rating' without qualification as to residuals or impairment.  . . .  Diagnosis alone is
sufficient to justify the minimum rating providing the condition is unfitting.  Higher ratings may
be awarded in consonance with degree of severity.  No rating lower than the 'minimum may be
used if the diagnosis is satisfactorily established unless specifically exempted by this regulation
or by higher authority.'"); accord DoDI 1332.39, ¶¶ 6.8 (indicating that observation ratings apply
to the military departments), 6.10.2 ("In some instances the VASRD provides a 'minimum
rating' without qualifications as to residuals or impairment.  Diagnosis alone is sufficient to
justify the minimum rating.  . . .  Although higher ratings may be awarded in consonance with
degree of severity, no rating lower than the 'minimum' may be used if the diagnosis is
satisfactorily established.").

## 2.  The National Defense Authorization Act for Fiscal Year 2008 and Related Regulations

On January 28, 2008, Congress enacted the National Defense Authorization Act for
Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3.  Title XVI of that Act was the Wounded
Warrior Act, id. § 1601, 122 Stat. at 431, in which Congress, among other things, directed the
Secretaries of the VA and the Department of Defense to "develop a policy on improvements to
the processes, procedures, and standards for the conduct of physical disability evaluations of
recovering service members by the military departments and by the Department of Veterans

Affairs," id. § 1612(b)(1), 122 Stat. at 422.  The policy was to be developed by July 1, 2008, id., and to include the following:

> [P]rocedures to eliminate unacceptable discrepancies and improve consistency among disability ratings assigned by the military departments and the Department of Veterans Affairs, particularly in the disability evaluation of recovering service members, which procedures shall be subject to the following requirements and limitations:
>
> > . . . .
>
> > (ii)  Under such procedures, each Secretary of a military department shall, to the extent feasible, utilize the standard schedule for rating disabilities in use by the Department of Veterans Affairs . . . .

Id. § 1612(b)(2)(B), 122 Stat. at 422.  In conjunction with this provision, Congress added a new section to chapter 61 of title 10 of the United States Code–10 U.S.C. § 1216a.  Id. § 1642, 122 Stat. at 465.  The new section provided:

> Utilization of VA Schedule for Rating Disabilities in Determinations of Disability.–
>
> (1)  In making a determination of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned–
>
> > (A)  shall, to the extent feasible, utilize the schedule for rating disabilities in use by the Department of Veterans Affairs, including any applicable interpretation of the schedule by the United States Court of Appeals for Veterans Claims; and
>
> > (B)  except as provided in paragraph (2), may not deviate from the schedule or any such interpretation of the schedule.

10 U.S.C. § 1216a(a) (2012).  Finally, Congress created the PDBR, which, as noted above, was charged with reviewing the findings and decisions of PEBs for former service members, like plaintiff, who were medically separated from service between September 11, 2001, and December 31, 2009, with a disability rating of 20% or less.  Pub. L. No. 110-181, § 1643, 122 Stat. at 465-67 (codified at 10 U.S.C. § 1554a).

On October 14, 2008, the Department of Defense issued a policy memorandum regarding implementation of the Wounded Warrior Act.  See Under Secretary of Defense for Personnel and Readiness, Memorandum for Secretaries of the Military Departments et al., "Policy Memorandum on Implementing Disability-Related Provisions of the National Defense

Authorization Act of 2008 (Pub. L. 110-181)" (Oct. 14, 2008).  By this memorandum, the Department of Defense rescinded DoDI 1332.39, "Application of the Veterans Administration Schedule for Rating Disabilities," and directed the military departments to follow the guidance attached to the memorandum.  Id.  Of particular note, the guidance attached thereto amended DoDD 1332.18, "Separation or Retirement for Physical Disability," to remove references to DoDI 1332.39 and to add a new enclosure, Enclosure 7, "Application of the Veterans Affairs Schedule for Rating Disabilities."  Id.  Enclosure 7 provided:

> The Secretaries of the Military Departments may not deviate from the schedule or any interpretation of the schedule, including any applicable interpretation of the VASRD by the United States Court of Appeals for Veterans Claims.  . . .

> E7.1.  GENERAL

>> . . . .

>> E7.1.2.  The Department of Veterans Affairs Schedule for Rating Disabilities (VASRD) shall be used in making ratings determinations for each of the medical conditions determined to be unfitting independently or due to combined effect, to include in combination with an independently unfitting condition.  . . .  For purposes of establishing a rating, the VASRD will be used in relation to the Service member's physical disability at the time of the evaluation.  If use of convalescent ratings and/or other interim ratings (i.e[.] prestabilization ratings) applies, the Service member may be placed on the Temporary Disability Retired List (TDRL) for reevaluation purposes.

>> E7.1.3.  Use of the VASRD is statutorily required, "to the extent feasible."  In applying the VASRD, any determination of infeasibility would have to be based on statutory differences between the DoD and VA disability systems, compelling differences in mission grounded in statute, or some other major difference in the 2 systems.  A policy disagreement or different medical opinion would not constitute infeasibility.

Id.  Enclosure 7 also provided:

> E7.2.  Mental Disorders Due to Traumatic Stress[.]  The Military Department Secretary concerned will abide by 10 USC 1216a and 38 CFR 4.129, VASRD for disposition of Service members found unfit because of a mental disorder due to traumatic stress.  When a mental disorder that develops on active duty as a result of a highly stressful event is severe enough to bring about release from active military service, the rating agency shall assign an evaluation of not less than 50 percent and schedule an examination within the 6 month period following

discharge to determine whether a change in rating and disposition is warranted. The disposition of Service members diagnosed with a mental disorder due to traumatic stress found to be an unfitting condition in the [disability evaluation system] process will be as follows:

> E7.2.1.  For members found unfit with a rating of 80% or greater for a permanent and stable condition (or conditions) not related to diagnosis of the mental disorder due to traumatic stress, the member will be permanently retired.
>
> E7.2.2.  All other such members must be placed on the Temporary Disability Retirement List (TDRL) and re-evaluated within a timeframe that is not less than 90 days, but within 6 months, from the date of placement on the TDRL[.]

Id.

The Department of Defense issued another memorandum on July 17, 2009, to clarify how the PDBR should apply VASRD § 4.129 to former service members seeking a review of their disability ratings.  See Office of the Under Secretary of Defense for Personnel and Readiness, Memorandum for Secretary of the Army et al., "Requests for Correction of Military Records Relating to Disability Ratings for Post Traumatic Stress Disorder" (July 17, 2009) ("July 2009 Memorandum").  That memorandum provided:

> DoD Instruction 6040.44, "Lead DoD Component for the Physical Disability Board of Review," June 27, 2008 (incorporating change 1, June 2, 2009), directs the PDBR in reviewing prior disability ratings to disregard any Military Department guidelines that were inconsistent with the VASRD.  While reliance on section 4.130, rather than section 4.129, was arguably consistent with the VASRD,[13] the PDBR has concluded that equity favors giving applicants the benefit of section 4.129.  Consultations with the [boards for correction of military records ("BCMRs")] indicate recognition of the desirability of consistency among the BCMRs and PDBR in adjudicating these cases.
>
> Therefore, as a matter of policy, the PDBR and all three BCMRs will apply VASRD Section 4.129 to PTSD unfitting conditions for applicants discharged after September 11, 2001, and in such cases, where a grant of relief is appropriate, assign a disability rating of not less than 50% for PTSD unfitting

---

[13]  The Department of Defense's use of the word "arguably" strongly suggests that it recognized the lack of statutory and regulatory support for the pre-2008 application of VASRD § 4.130 over VASRD § 4.129, and, consequently, that the military departments' prior disability ratings were–at their members' expense–contrary to statute and regulation.

conditions for an initial period of six months following separation, with subsequent fitness and PTSD ratings based on the applicable evidence.

Id. at 1-2 (footnote added).

### 3. The Army Was Required to Apply VASRD § 4.129 Prior to 2008

Defendant concedes that prior to 2007, the Army was generally required to apply the VASRD when assigning disability ratings to soldiers deemed unfit for duty. However, defendant contends that 10 U.S.C. § 1201, the statute regarding disability retirement determinations, does not address whether the Army "should utilize the VASRD for purposes of convalescent or temporary ratings." Def.'s Mot. 23. As a result, defendant asserts, the Department of Defense and the Army issued regulations rejecting the use of convalescent ratings, and the Army issued two substantially identical policy memoranda specifically identifying VASRD § 4.129 as a convalescent rating that its PEBs should not apply.[14] Accordingly, defendant argues, the Army's decision not to apply VASRD § 4.129 to plaintiff was permissible.

There are several flaws with defendant's position. First, the Army's interpretation of VASRD § 4.129 as a convalescent rating was not contained in a statute or an Army regulation, but instead appeared in two substantially identical policy memoranda that were sent to the presidents of the Army's PEBs. Such internal memoranda lack the force of law and are therefore not entitled to deference. See Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000). Instead, the interpretations contained in the policy memoranda "are 'entitled to respect' . . . , but only to the extent that those interpretations have the 'power to persuade.'" Id. (citation omitted).

The court does not find the Army's interpretation of VASRD § 4.129 as a convalescent rating to be persuasive because that interpretation is belied by the plain language of the VASRD. As described in VASRD § 4.30, a convalescent rating is a 100% total disability rating assigned without regard to other provisions of the VASRD when treatment for a disability resulted in (1) "[s]urgery necessitating at least one month of convalescence"; (2) "[s]urgery with severe postoperative residual[]" effects; or (3) "[i]mmobilization by cast, without surgery," of at least one major joint. 38 C.F.R. § 4.30. VASRD § 4.129 neither requires a 100% total disability rating nor concerns a disability that requires treatment with surgery or a cast. Further, the portion of the VASRD related to mental disorders includes a section expressly dealing with convalescent

---

[14] In its July 2009 Memorandum, the Department of Defense noted: "Historically, the practice of the Military Departments['] disability agencies was to complete the comprehensive section 4.130 mental health assessment prior to the member's separation, and therefore dispense with section 4.129." Defendant did not provide the court with documentation from the other military departments specifically indicating their decisions not to apply VASRD § 4.129. Indeed, plaintiff reports that–aside from the Army policy memoranda from 2002 and 2005–he was unable to locate any military regulation or policy memorandum in which a military department interpreted VASRD § 4.129 as a convalescent rating.

ratings, separate and distinct from VASRD § 4.129, which describes a convalescent rating for a mental disorder as a 100% total disability rating "due to a continuous period of hospitalization lasting six months or more . . . ." See id. § 4.128. As previously noted, VASRD § 4.129 does not require a 100% total disability rating. Nor does VASRD § 4.129 contain a hospitalization requirement. And finally, unlike VASRD § 4.30 and VASRD § 4.128, VASRD § 4.129 does not refer to either convalescent ratings in particular or convalescence more generally. In fact, VASRD § 4.129 appears to be a minimum rating–a type of VASRD disability rating that the Army has embraced–rather than a convalescent rating. See Army Regulation 635-40, ¶ B-15(b); DoDI 1332.39, ¶ 6.10.2. In short, the Army mischaracterized and misinterpreted VASRD § 4.129 as a convalescent rating in its 2002 and 2005 policy memoranda.

Second, neither federal statute nor the specific binding regulation promulgated by the Army to govern its disability evaluation system classified VASRD § 4.129 as a convalescent rating or prevented a PEB from applying VASRD § 4.129 to soldiers deemed unfit for duty due to PTSD. See generally 10 U.S.C. ch. 61 (2006); Army Regulation 635-40. The relevant Department of Defense regulations also lack such provisions. See generally DoDD 1332.18; DoDI 1332.38; DoDI 1332.39. Thus, there were no statutory or regulatory prohibitions to applying VASRD § 4.129 to those soldiers deemed unfit for duty due to PTSD at the time of plaintiff's discharge.

Third, the decision relied upon by defendant in support of its position, Petri v. United States, 104 Fed. Cl. 537 (2012), is neither binding on this court nor persuasive. In Petri, the court remarked:

> [I]t appears that in 2006, the Air Force was not required, by regulation, to place plaintiff on the Temporary Disability Retired List pursuant to Veterans Administration Schedule for Rating Disabilities § 4.129, before separating him from the Air Force in 2006. The VA regulation, Veterans Administration Schedule for Rating Disabilities § 4.129, was not applied to the Department of Defense until 2008. See Policy Memorandum on Implementing Disability–Related Provision[s] of the National Defense Authorization Act of 2008, Oct. 14, 2008 (2008 Memorandum).

Id. at 553. The court further explained in a footnote:

> The 2008 Memorandum provided: "The Military Department Secretary concerned will abide by 10 USC 1216a and 38 CFR § 4.129, VASRD [Veterans Administration Schedule for Rating Disabilities] for disposition of Service members found unfit because of a mental disorder due to traumatic distress." [sic] A subsequent memorandum, DoDI Memorandum, July 17, 2009, "Requests for Correction of Military Records Relating to Disability Ratings for Post Traumatic Stress Disorder" (2009 Memorandum), stated: "Policy Memorandum on Implementing Disability–Related Provisions of the National Defense

Authorization Act for 2008 (Pub. L. 110–181), October 14, 2008, directed the
application of VASRD [Veterans Administration Schedule for Rating Disabilities]
section 4.129 to PTSD unfitting conditions, effective as of the date of enactment
of that law, January 28, 2008." Therefore, prior to the enactment of the 2008 law,
Veterans Administration Schedule for Rating Disabilities § 4.129 was not
required to be applied.

Id. at 553 n.22. Thus, the court in Petri relied solely upon the Department of Defense's
statements that VASRD § 4.129 did not apply to the Department of Defense until the enactment
of the Wounded Warrior Act on January 28, 2008. However, the mere fact that the Department
of Defense stated that it was not required to apply VASRD § 4.129 until January 28, 2008, does
not mean that the military departments were not obligated by statute and regulation to apply
VASRD § 4.129 before that date. Accordingly, the court declines to follow Petri.

In sum, when plaintiff was discharged from the Army in 2007, the Army was required to
apply VASRD § 4.129 to soldiers, like plaintiff, who met its criteria. Defendant's motion to
dismiss must therefore be denied.

## III.  THE PARTIES' CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Having denied defendant's motion to dismiss, the court turns to the parties' cross-motions
for judgment on the administrative record, filed pursuant to RCFC 52.1(c). In ruling on such
motions, the court must decide whether the moving party is entitled to judgment based on the
evidence in the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1356
(Fed. Cir. 2005) ("[J]udgment on the administrative record is properly understood as intending to
provide for an expedited trial on the administrative record.").

### A.  Plaintiff's First Claim for Relief

As discussed above, plaintiff's first claim for relief concerns the Army's conduct in 2007
when it assigned plaintiff a 10% disability rating for his PTSD and separated him with severance
pay. In his motion for judgment on the administrative record, plaintiff contends that the Army's
failure to apply VASRD § 4.129 to him when he was diagnosed with PTSD and deemed unfit for
duty was contrary to law. In response, defendant contends that plaintiff has waived his challenge
to the Army's 2007 disability determination and, in the alternative, that the Army's decision to
assign plaintiff a 10% disability rating for his PTSD was supported by substantial evidence. The
court first addresses defendant's threshold waiver argument.

Defendant contends that the Army's assignment of a 10% disability rating for plaintiff's
PTSD is not reviewable by this court because plaintiff voluntarily accepted the recommendation
of the informal PEB and waived his right to a hearing before a formal PEB. As defendant notes,
it is well settled in this court that a former service member's knowing and voluntary decision to

-37-

waive a hearing before a formal PEB precludes judicial review of the informal PEB's recommendation.  See, e.g., Watson v. United States, 113 Fed. Cl. 615, 632 (2013) ("Courts have indeed consistently held that a service member's waiver of the right to challenge an informal PEB's findings before a formal PEB is also a waiver of the service member's right to judicial review of the informal PEB decision."), clarified, 118 Fed. Cl. 266 (2014), modified, No. 12-785C, 2015 WL 4914966 (Fed. Cl. Aug. 17, 2015); Warner v. United States, 103 Fed. Cl. 408, 413 (2012) ("[T]he waiver of a formal PEB review also acts as a waiver of judicial review of the [informal PEB]."); Williams v. United States, 100 Fed. Cl. 263, 277 (2011) ("Having voluntarily accepted his thirty percent disability ratings by concurring with the informal PEBs' determinations and waiving his right to formal PEB hearings, [the plaintiff] agreed to be bound by the informal PEBs' decisions."); Stine v. United States, 92 Fed. Cl. 776, 791-94 (2010), aff'd per curiam, 417 F. App'x 979 (Fed. Cir. 2011) (mem.); Van Cleave v. United States, 66 Fed. Cl. 133, 136 (2005) ("Plaintiff's voluntary waiver of a formal PEB precludes judicial review of the informal PEB's determination."); Gant v. United States, 63 Fed. Cl. 311, 316-19 (2004), aff'd per curiam, 417 F.3d 1328 (Fed. Cir. 2005).  When addressing a claim of waiver, the court must first determine whether the former service member actually waived his right to a hearing before a formal PEB.  See Van Cleave v. United States, 402 F.3d 1341, 1343-44 (Fed. Cir. 2005) (recognizing that the plaintiff's signing of the Election of Options form amounted to a waiver). If such a waiver exists, then the court must make two additional determinations:  the scope of the waiver, id. at 1344, and whether the waiver was knowing and voluntary, id.; Gant, 417 F.3d at 1332.

Defendant argues, and the court agrees, that plaintiff did waive a hearing before the formal PEB.  That waiver is evidenced by plaintiff's initials and signatures on the DA Form 5893-R, "Acknowledgment of Notification of Formal Physical Evaluation Board Hearing," and the DA Form 199, "Physical Evaluation Board (PEB) Proceedings."  Moreover, plaintiff's signatures and initials on those forms reflect that his waiver was knowing and voluntary; he indicated that he received counseling and understood all of his options and the consequences of choosing each of those options.[15]  The remaining issue–the scope of plaintiff's waiver–is not as straightforward.

Plaintiff argues that even if the evidence in the administrative record reflects a knowing and voluntary waiver of a hearing before a formal PEB, that waiver does not preclude judicial review of the informal PEB's recommendation.  Specifically, he contends that it would have been futile to demand a hearing before a formal PEB because the Army had a blanket policy of

---

[15]  In his reply brief, plaintiff argues, for the first time, that his waiver was not voluntary. Because plaintiff did not raise this argument in his opening brief, he has waived it.  See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("[A]rguments not raised in the opening brief are waived."); Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief–they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").

not applying VASRD § 4.129 to soldiers deemed unfit for duty due to PTSD; in other words, it would have been useless to ask a formal PEB to apply VASRD § 4.129 to him.

Plaintiff premises his futility argument on the fact that in nearly all of the decisions in which this court stated that a knowing and voluntary waiver of a hearing before a formal PEB precludes judicial review of the informal PEB's recommendation, the court relied upon the decision of the United States Supreme Court ("Supreme Court") in United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33 (1952), or another decision that itself relied upon L.A. Tucker Truck Lines, Inc. In L.A. Tucker Truck Lines, Inc., the Supreme Court held: "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." Id. at 37; see also id. (remarking that "orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts").

However, as plaintiff notes, the United States Court of Appeals for the Federal Circuit, in applying the administrative exhaustion requirement set forth in L.A. Tucker Truck Lines, Inc., has recognized an exception to that requirement for futility. See Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1384 (Fed. Cir. 2008) (citing Corus Staal BV v. United States, 502 F.3d 1370, 1378-79 & n.4 (Fed. Cir. 2007)). "To show futility, a party must demonstrate that it 'would be required to go through obviously useless motions in order to preserve [its] rights.'" Mittal Steel Point Lisas Ltd., 548 F.3d at 1384 (quoting Corus Staal BV, 502 F.3d at 1379). Courts apply the futility exception narrowly. Id.; Corus Staal BV, 502 F.3d at 1379. "The mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." Corus Staal BV, 502 F.3d at 1379.

Plaintiff's futility argument does not survive close scrutiny. First, there is no allegation or evidence that plaintiff was aware at the time of his discharge that the Army had a policy of not applying VASRD § 4.129 to soldiers deemed unfit for duty due to PTSD. Thus, when he was discharged, plaintiff had no reason not to challenge the Army's application of VASRD § 4.130, rather than VASRD § 4.129, to him. Stated differently, plaintiff could not have understood that such a challenge would be futile.

Second, even had plaintiff been aware of the Army's policy, binding precedent reflects that the futility exception should not be applied merely because an adverse decision from the relevant agency is expected. To the extent that plaintiff expected an adverse decision from a formal PEB due to the Army's policy and therefore opted not to seek a hearing before a formal PEB, that expectation is insufficient to satisfy the narrowly applied futility exception to the exhaustion requirement. Indeed, in L.A. Tucker Truck Lines, Inc., the Supreme Court specifically rejected the contention that administrative exhaustion can be excused if an agency has "a predetermined policy . . . which would have required it to overrule the objection if made,"

because the agency "deal[t] with a large number of like cases" and "[r]epetition of the objection in [those cases] might [have] lead to a change of policy, or, if it did not, the [agency] would at least [have been] put on notice of the accumulating risk of wholesale reversals being incurred by its persistence." 344 U.S. at 37.  Plaintiff never put the Army on notice that he believed that it was misapplying the VASRD, an action that may have provided the Army with the impetus to change its policy.

In sum, plaintiff knowingly and voluntarily waived his right to a hearing before a formal PEB.  As a result, he is precluded from challenging, in this court, the Army's 2007 assignment of a 10% disability rating for his PTSD, which was based on the findings and recommendations of an informal PEB.[16]  Accordingly, with respect to plaintiff's first claim for relief, the court grants defendant's motion for judgment on the administrative record and denies plaintiff's cross-motion for judgment on the administrative record.

### B.  Plaintiff's Second Claim for Relief

In his second claim for relief, plaintiff challenges the Army's 2014 decision to reject the PDBR majority's recommendation that plaintiff be retired with a 30% PTSD disability rating.  Defendant argues that the Army's decision was supported by substantial evidence.  Plaintiff responds that the Army acted contrary to law by failing to resolve reasonable doubt in his favor and that the Army failed to consider relevant evidence.  Upon reviewing the pertinent statutes and regulations, the court concludes that the Army acted contrary to law.

### 1.  Standard of Review

The Secretary of the Army's decision to reject the PDBR's recommendation was authorized by 10 U.S.C. § 1554a(e)(1), and is entitled to deference.  See Bray v. United States, 515 F.2d 1383, 1391 (Ct. Cl. 1975) (per curiam) (noting that in a "trial de novo, deference is accorded the judgment and expertise of the administrative decision-maker"); see also Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (noting that a court is not to substitute its judgment for that of a military department "when reasonable minds could reach differing conclusions on the same evidence").  Accordingly, the court may only "review the rationale underlying the Secretary's decision to determine if the decision was arbitrary, capricious, unsupported by substantial evidence, or in violation of law." Strickland v. United States, 423 F.3d 1335, 1339 (Fed. Cir. 2005); accord Boyd v. United States, 207 Ct. Cl. 1, 4 (1975) ("The court . . . may reject the decision of a Secretary only if he has exercised his discretion arbitrarily, capriciously, in bad faith, contrary to substantial evidence, or where he has gone outside the board record, or fails to explain his actions, or violates applicable law or regulations."); see also Silbaugh v. United States, 107 Fed. Cl. 143, 149 (2012) ("The court reviews the PDBR decision

---

[16]  As a result of this conclusion, the court need not address whether the Army's assignment of a 10% disability rating for plaintiff's PTSD was arbitrary, capricious, an abuse of discretion, or contrary to law.

under a standard that is no more strict than the baseline deferential standard governing the decision of a correction board–the court "will not disturb the decision of the [board] unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." (quoting <u>Barnick v. United States</u>, 591 F.3d 1372, 1377 (Fed. Cir. 2010))).

**2.  The Army's Decision to Assign Plaintiff a 10% Disability Rating for His PTSD After Six Months of Constructive Placement on the TDRL Was Contrary to Law**

In the brief that he submitted in support of his application to the PDBR, plaintiff argued–correctly, as discussed above–that the Army should have applied VASRD § 4.129 to him at the time of his discharge in 2007.  However, the PDBR's recommendations, and the Army's final decision rejecting these recommendations, were not premised on plaintiff's argument that the Army should have applied VASRD § 4.129 to him in 2007.  Rather, the PDBR and the Army were proceeding pursuant to the Department of Defense's July 2009 Memorandum, in which the Department of Defense instructed the PDBR to

> apply VASRD Section 4.129 to PTSD unfitting conditions for applicants discharged after September 11, 2001, and in such cases, where a grant of relief is appropriate, assign a disability rating of not less than 50% for PTSD unfitting conditions for an initial period of six months following separation, with subsequent fitness and PTSD ratings based on the applicable evidence.

July 2009 Memorandum 2.  The final portion of this instruction is contrary to law.

When plaintiff was referred to the PEB in 2007, the PEB was required to assess whether plaintiff was unfit for duty and, if so, assign an appropriate disability rating.  The informal PEB determined that plaintiff was unfit for duty due to his PTSD.  Consequently, as noted above, the informal PEB should have used VASRD § 4.129 to assign plaintiff a disability rating of 50%.  Based on the mandatory 50% disability rating, the Army then had two options:  retire plaintiff pursuant to 10 U.S.C. § 1201 or place plaintiff on the TDRL pursuant to 10 U.S.C. § 1202.  If the Army chose the latter option, then it was required, pursuant to VASRD § 4.129 and/or 10 U.S.C. § 1210, to schedule one or more follow-up examinations to determine whether plaintiff's condition had changed since being placed on the TDRL.  <u>Accord</u> Army Regulation 635-40, ¶ 7-17(a).  The results of those follow-up examinations would have been forwarded to a PEB for review.  <u>Id.</u> ¶¶ 7-19(c), 7-20(b) to (c).  If, at any point, the PEB recommended that plaintiff be removed from the TDRL, then plaintiff would have been entitled to the same procedural protections available to him when the informal PEB initially found him unfit for duty due to his PTSD.  <u>Id.</u> ¶ 7-20(e)(1), (3).  Depending upon the final disability rating assigned by the Army, plaintiff would have either been separated with severance pay, 10 U.S.C. § 1210(e), or permanently retired, <u>id.</u> § 1210(c).  If plaintiff was not removed from the TDRL after five years and his disability still existed, then the Army would have been required to deem the disability permanent and stable, effectively requiring plaintiff's removal from the TDRL.  <u>Id.</u> § 1210(b).

Upon reviewing plaintiff's application in 2014, the PDBR recommended, and the Army agreed, that plaintiff should be constructively placed on the TDRL for six months with a 50% disability rating for his PTSD in accordance with VASRD § 4.129.  Notwithstanding its constructive nature, the Army's placement of plaintiff on the TDRL triggered the statutory and regulatory requirements that flow from a soldier's placement on the TDRL.  These requirements include arranging a follow-up examination and convening a new PEB to reassess plaintiff's 50% disability rating.  Of course, these are impossible tasks.  The Army constructively placed plaintiff on the TDRL for six months effective July 30, 2007; it cannot go back in time to January 2008 (six months) or January 2009 (eighteen months) to schedule a follow-up examination and convene a new PEB.  But the fact that it is impossible for the Army to schedule a follow-up examination and convene a new PEB within the time required by statute and/or regulation does not authorize the Army to disregard the statutory and regulatory requirements that govern the administration of the TDRL.  Just as the Army required a legal basis for constructively placing plaintiff on the TDRL, it required a legal basis for constructively removing plaintiff from the TDRL.  Accordingly, because the Army failed to schedule a follow-up examination and convene a new PEB for plaintiff–the statutory and regulatory prerequisites for removing a soldier from the TDRL–it was required to retain plaintiff on the TDRL for as long as was legally authorized.  In other words, the Army was not permitted to constructively remove plaintiff from the TDRL after six months.  Indeed, allowing the Army to remove plaintiff from the TDRL–even constructively– due to its failure to comply with the law would reward the Army for its own errors.

Moreover, it was improper for the PDBR to recommend, and the Army to assign, a new disability rating to plaintiff based on the mental health examination that lead to plaintiff's constructive placement on the TDRL in the first instance.  The purpose of the periodic examinations that follow a soldier's placement on the TDRL is to determine whether the soldier's condition had changed since the previous examination and diagnosis.  Id. § 1210(a) (2012); Army Regulation 635-40, ¶ 7-20(b) to (c).  Logically, the Army could not have determined whether plaintiff's condition had changed based solely on the examination that preceded his discharge and the absence of an examination six months after his discharge.  Allowing the Army to make a determination with such evidence (and lack of evidence) is, once again, tantamount to rewarding the Army for its own error–its failure to schedule the follow-up examination for plaintiff pursuant to statute and regulation.

In sum, plaintiff did not obtain the relief to which he was entitled from the PDBR or the Army under the controlling statutes and regulations.  Once the Army constructively placed plaintiff on the TDRL effective July 30, 2007, it could not constructively remove plaintiff from the TDRL in the absence of a follow-up examination and a new PEB.  Moreover, the fact that plaintiff underwent VA PTSD review examinations on May 21, 2009, and April 27, 2011, is not sufficient to satisfy the statutory and regulatory requirements, for two reasons.  First, the Army did not convene PEBs following the VA's examinations.  Second, the PDBR is not empowered to sit as a PEB; it is only authorized to review the preexisting findings and decisions of a PEB. See 10 U.S.C. § 1554a(a)(1), (c)(1).  Thus, because a PEB did not review the VA PTSD review

examinations and issue findings and recommendations based on its review, the PDBR could not have issued a new or modified disability rating based on those examinations.

Because the Army failed to schedule a follow-up examination and convene a new PEB for plaintiff, it was legally required to constructively retain plaintiff on the TDRL for the five-year maximum period provided by 10 U.S.C. § 1210(b)–in other words, until July 30, 2012. And, again, because the Army failed to schedule a follow-up examination and convene a new PEB at the end of plaintiff's constructive five-year term on the TDRL, the Army, upon considering plaintiff's application to the PDBR, should have constructively removed plaintiff from the TDRL with his original 50% PTSD disability rating. See 10 U.S.C. § 1554a(d)(3) (indicating that the PDBR cannot recommend a reduction of the disability rating assigned by the PEB).

The court concludes that the Army acted contrary to law when it assigned plaintiff a 10% disability rating for his PTSD after six months of constructive placement on the TDRL.[17] Consequently, with respect to plaintiff's second claim for relief, the court denies defendant's motion for judgment on the administrative record and grants plaintiff's cross-motion for judgment on the administrative record.

## IV. CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion to dismiss, **GRANTS IN PART** and **DENIES IN PART** defendant's motion for judgment on the administrative record, and **GRANTS IN PART** and **DENIES IN PART** plaintiff's cross-motion for judgment on the administrative record. Further, because the court did not consider the declaration attached to plaintiff's reply brief in reaching its decision, the court **DENIES** defendant's motion to strike as **MOOT**.

This case is **REMANDED** to the Army for the correction of plaintiff's military records in accordance with the following instructions:

- The Army shall correct plaintiff's military records to reflect the following:

    - Plaintiff was constructively placed on the TDRL beginning on the date of his discharge–July 30, 2007–and ending five years from that date, in accordance with 10 U.S.C. § 1210(b).

    - At the time of plaintiff's constructive removal from the TDRL, plaintiff was assigned a 50% disability rating for his PTSD.

-------

[17] Due to this conclusion, the court need not address whether the Army's decision was supported by substantial evidence, whether the Army disregarded relevant evidence, or whether the Army failed to resolve reasonable doubt in plaintiff's favor.

- Plaintiff was permanently retired upon his removal from the TDRL pursuant to 10 U.S.C. § 1210(c) and 10 U.S.C. § 1201 (so long as plaintiff met the remaining criteria set forth in 10 U.S.C. § 1201 on the date of his constructive removal from the TDRL).

- The Army may make any other corrections that are required to carry out the court's instructions.

- The Army shall issue any orders required to ensure that plaintiff receives the retired pay and other benefits to which he is entitled.

- The remand period shall terminate on **Thursday, April 21, 2016**.  The court **STAYS** proceedings in the instant case during that time.  If the Army has not corrected plaintiff's records and provided the relief to which plaintiff is entitled in accordance with those corrections by April 21, 2016, the parties shall follow the procedures set forth in RCFC 52.2(d).

- Pursuant to RCFC 52.2(b)(1)(D), defendant shall file a status report every ninety days, with the first one due **no later than Tuesday, January 19, 2016**, indicating the status of the proceedings at the Army.

- When the Army has corrected plaintiff's military records and awarded plaintiff the retired pay and other benefits to which he is entitled due to those corrections, it shall forward two copies of its documentation that those tasks have been completed to the clerk of the Court of Federal Claims pursuant to RCFC 52.2(e).  The parties shall then file, **within thirty days** of the filing of the Army's documentation, the notices required by RCFC 52.2(f)(1).

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge